## In re Asbestos Litigation

*Lawrence R. Cohan, Robert E. Paul, Benjamin P. Shein, Mark G. Strauss, George W. Howard III, Edward V. Reeves* and *Stephen J. Cooperstein,* for plaintiffs.

*Joel D. Caney, Michael J. Stack Jr., Thomas A. Leonard, Paul S. Diamond* and *Mathieu J. Shapiro,* for defendant.

TERESHKO, *J.,* June 11, 2002—This matter comes before the court on defendant Crown, Cork & Seal's global motion for summary judgment in all of the cases in which it is an original defendant or additional defendant, that are pending in the Philadelphia Court of Common Pleas.

The specific captions are identified in appendix "A" to this opinion. The total number of cases is 376. The number of defendants sued is 12,809.[1] They are identified by plaintiff's law firms:

| Firm | Number of Cases |
| --- | --- |
| Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley P.C. | 92 |
| Brookman, Rosenberg, Brown & Sandler | 201 |
| Early & Strauss | 1 |
| Paul, Reich & Myers P.C. | 60 |
| Shein Law Center | 17 |
| Howard, Brenner & Nass P.C. | 6 |

1. This number includes a duplication of defendants since many of the same defendants are sued in each case.

Each of the plaintiff law firms filed an answer in opposition or joined an answer in opposition to the motion for summary judgment except for the Early & Strauss firm, which did not respond.

The court has jurisdiction to hear the consolidated motion under the Mass Tort Procedural Rules by which these asbestos cases are consolidated for pretrial purposes, which includes all dispositive motions.

Briefs and reply briefs were submitted and oral argument was held on April 3, 2002. In addition, supplemental briefs were submitted following oral argument.

This motion seeks to dismiss all of the asbestos actions now pending against defendant, Crown, Cork & Seal.

In order to place this action into a proper context, a review of the history of "Asbestos Litigation" is appropriate.[2]

## THE LITIGATION

Asbestos litigation is now the longest-running mass tort litigation in the United States.

In the "early stages" of the litigation, the defendants were primarily asbestos mining companies, manufacturers and distributors of asbestos insulation products, or installers of asbestos insulation products. Shipbuilders are a prime example of installers of asbestos insulation

---

2. Unless otherwise noted, the source for this "history" is the study done by the Institute for Civil Justice at RAND, entitled "Asbestos Litigation In the U.S.: A New Look at an Old Issue," August 2001, by Deborah Hensler, Stephen Carroll, Michelle White, and Jennifer Gross.

products. These defendants are often referred to as "traditional defendants."

It is generally accepted that the full magnitude and scope of the asbestos issue was not fully appreciated in its initial stages. This was the case in both the number of cases being filed and the dollar amounts required to defend and resolve the matters. From the initial list of 300 or so defendant companies, the list is now up to about 1,000.[3] The size of the companies range from billions of dollars in revenue, to a few million dollars in revenue. The number of claims, originally estimated to be in the hundreds of thousands, grew into the many millions.

The enorminity of the litigation forced the early defendants into bankruptcy or reorganization under bankruptcy laws. An early victim of the litigation was the Johns-Manville Corporation, which initially filed for bankruptcy protection in the early-1980s and emerged in the mid-1980s under a plan of reorganization that created the Johns-Manville Trust for resolution of asbestos claims.

The "trust," as it was originally established, had as its objective the satisfaction of all asbestos claims that "would ever appear." Each claim would be paid at its fully liquidated value or, to use a common phrase, on a "dollar for dollar" basis.

By 1991, the number of claims against the "trust" had risen to 171,000 and the fund was depleted after about six years. The period from late 2000 to early 2001 saw the claims against the trust soar. The estimate is now that 1,500,000 to 2,500,000 additional claims will be received.

---

3. *Id.* at 5.

This has forced the "trust" to set a payout rate of "five cents on the dollar" of the fully liquidated value of the individual claims.

The high number of claims against the Johns-Manville Trust is not a unique experience. It has been identified that of the other asbestos defendants in bankruptcy, two had over 300,000 claims, another two had over 400,000 claims and one had over 500,000 claims.[4]

As stated previously, the initial group of traditional defendants in the early 1980s is estimated to be around 300 and the list is currently over 1,000 with the expectation that many more will be brought into the litigation, increasing this number. The reason for this increase in the number of defendants, despite the fact that asbestos has been banned by the Environmental Protection Agency since the mid 1970s, can in part be found in the changing identity of the asbestos defendant. The list now includes "construction contractors, automotive parts manufacturers, refineries and textile mills, retailers and insurers."[5]

With the increase in the number of companies being brought into the asbestos litigation, the number of bankruptcies has also grown. It is estimated that 41 asbestos defendants have declared bankruptcy, with a surge since January of 2000, as reflected below:

| Company | Bankruptcy[6] Petition Date |
| --- | --- |
| Babcock & Wilcox | February 2000 |
| Pittsburgh Corning | April 2000 |

4. *Id.* at 2.
5. *Id.* at 5.
6. *Id.* at 20, appendix A.

| | |
|---|---|
| Owens Corning | October 2000 |
| Armstrong World Industries | December 2000 |
| G-I Holdings | January 2001 |
| W.R. Grace | April 2001 |
| U.S. Gypsum | June 2001 |
| United States Mineral Products | July 2001 |

Within these bankruptcies, certain financial information is available through the companies' filings. This information provides a partial picture of the cost of the litigation. The true cost can only be the subject of speculation because there is no data repository for this information. The cost is also not fully revealed because defendants in many cases retain this information confidentially and there is little or no sharing with other defendants.

What information that is available allows certain inferences to be drawn about the cost of the litigation to the recent past.

Based upon public information from U.S. insurers, the amount spent on asbestos litigation was about $21.6 billion as of mid-2001. It is estimated that this amount represents 30 percent of the amount spent, with foreign insurers paying 31 percent and defendant corporations paying the remaining 39 percent from corporate assets. Converting these percentages into dollars, based upon the U.S. insurer dollar payment of $21.6 billion would result in a total cost as of mid 2001 as follows:

| | | |
|---|---|---|
| U.S. insurers | 30 % = | $21.6 billion |
| Foreign insurers | 31 % = | 22.3 billion |
| Corporate assets | 39 % = | 28.1 billion |
| | | $72.0 billion |

It has been estimated that the amount of money required to resolve the remaining claims will push the cost to all insurers and corporations to $200 billion dollars.

## THE DEFENDANT

Crown, Cork & Seal, is a defendant in this asbestos litigation, not as a result of any direct liability from manufacturing, selling, installing, etc., of any asbestos product, but only from its acquisition of another company that did. See affidavit of Richard L. Krzyzanowski attached as exhibit "C" to defendant's. motion for summary judgment. This fact is not contradicted.

In 1963, Crown purchased Mundet Cork, a company that manufactured bottle caps, just as Crown did. See *id.* As part of this purchase, Crown also acquired the other part of Mundet Cork's business which was the "insulation" division that manufactured, sold and installed asbestos products. *Id.* Crown's only interest was in the "closure" part as evidenced by the fact that Mundet "shut down" the insulation division prior to Crown acquiring the Mundet stock and within 90 days after the acquisition, Mundet sold the insulation division to another company. *Id.*

As a result of this brief passive ownership, Crown incurred successor liability to Mundet Cork's tortious activity in operating its insulation division. See appendix "B" attached hereto. [not published herein]

## THE LEGISLATION

Generally identified as Senate bill 216, the legislation's relevant part here is the amendment of title 15 of the

Pennsylvania Consolidated Statutes. Section 1929.1 is titled, "Limitations on asbestos-related liabilities relating to certain mergers or consolidations." 15 Pa.C.S. §1929.1.

The operational aspect of the bill is found in paragraph (a)(1):

"(1) Except as further limited in paragraph (2), the cumulative successor asbestos-related liabilities of a domestic business corporation that was incorporated in this Commonwealth prior to May 1, 2001, shall be limited to the fair market value of the total assets of the transferror determined as of the time of the merger or consolidation, and such corporation shall have no responsibility for successor asbestos-related liabilities in excess of such limitation." *Id.*

Another section of the bill further defines the term "fair market value." In essence, it adjusts the value of the assets of the merged company at the time of merger, with an enhancement provision that would increase the value of the assets at the published prime rate plus 1 percent per year, without compounding the increase each year. 15 Pa.C.S. §1929.1(c).

The purpose of the bill was succinctly stated by Senator Stack, one of the 16 sponsors of the bill.

"Senator Stack: Madam President, I also rise in support of Senate bill no. 216. I rise today to discuss legislation that will have an important impact on Pennsylvania public policy. It should be a basic governmental interest to make sure our corporate merger laws do not unfairly expose innocent companies to ruin solely because of a merger.

"It is now evident that as an unforeseen consequence of mergers that happened in the past, Pennsylvania corporations that never themselves produced, sold, or installed asbestos products may become subject to asbestos-related liabilities. Similarly, the amount of assets fairly available to satisfy those asbestos-related liabilities may have become unfairly and unjustly enlarged. There is an unprecedented avalanche of asbestos-related claims made in the United States today. What has been described by the U.S. Supreme Court as an elephantine mess that the court has called out for legislative solutions. In view of this historically unprecedented situation, it is an essential governmental interest and matter of public policy that the amount of assets available to satisfy asbestos-related claims be fairly limited to the value of assets of the person or company that actually caused the damage through the production, sale, or installation of asbestos.

"What this all boils down to is really an issue of fairness. That is the goal of this legislation, to achieve some measure of fairness for Pennsylvania companies like Crown, Cork & Seal." Pa. Legis. Journal—Senate (December 11, 2001), 1231.

## THE CONTROVERSY

Defendant Crown argues that it is now entitled to relief under the legislation as the maximum damages it might pay under successor liability to Mundet Cork has been exceeded and it is no longer liable for additional damages.

Answering, plaintiffs raise arguments that the legislation violates various provisions of the Pennsylvania Con-

stitution and the United States Constitution and other arguments regarding the motion's defects. These arguments are organized as follows:

I. Federal constitutional arguments

(A) The statute violates the federal "Commerce clause" and "Equal protection."

(B) Defendant's counterargument that the plaintiffs lack standing to raise these constitutional claims.

II. State constitutional arguments

(A) Retroactive application of the statute to these plaintiffs violates the Pennsylvania Constitution

(B) The statute sets an unconstitutional limit on personal injury damages which is prohibited by Article 3, Section 18 of the Pennsylvania Constitution.

(C) The statute is an unconstitutional "Special law" prohibited by Article 3, Section 32.

(D) The statute was constitutionally flawed in the manner of its enactment, violating Article 3, Section 1 and Section 3.

## LEGAL DISCUSSION

### I. *Federal Constitutional Arguments*

#### A. Plaintiffs Argue That the Statute Violates the Federal Commerce Clause and Equal Protection

Before proceeding to the merits of the motion before the court, it is necessary to set forth the standard by which the court has reviewed this motion. The principles governing a motion for summary judgment are well-settled.

Summary judgment may be granted when the pleadings, depositions, interrogatory answers, admissions, affidavits, and expert reports, if any, show that there is no genuine issue as to any material fact and that the record entitles the moving party to judgment as a matter of law. Pa.R.C.P. 1035.1 and 1035.2. All doubts as to the existence of a genuine issue as to a material fact must be resolved against the moving party. *Breslin by Breslin v. Ridarelli,* 308 Pa. Super. 179, 454 A.2d 80 (1982). The moving party bears the burden of demonstrating that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. *Thompson Coal, Company v. Pike Coal Company,* 488 Pa. 198, 412 A.2d 466 (1979). In determining whether the moving party has met this burden, the court must examine the record in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences. *Elder v. Nationwide Insurance Co.,* 410 Pa. Super. 290, 599 A.2d 996 (1991). Once a motion for summary judgment is made and is properly supported, the non-moving party may not simply rest upon the mere allegations or denials in her pleadings. Pa.R.C.P. 1035.3. The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Curran v. Children's Service Center of Wyoming County Inc.,* 396 Pa. Super. 29, 578 A.2d 8 (1990). The purpose of Pa.R.C.P. 1035 is "to assure that the motion for summary judgment may 'pierce the pleading' and to require the opposing party to disclose the facts of his claim." *Roland v. Kravco Inc.,* 355 Pa. Super. 493, 501, 513 A.2d 1029, 1034 (1986).

In opposition to the motion for summary judgment, plaintiffs maintain that the enactment of the Pennsylva-

nia Legislature violates the commerce clause of the United States Constitution. See Brookman's response to motion for summary judgment, pp. 6-9; Paul's response brief, section V.

Plaintiffs lay out their argument by stating that, "It is well established that the federal commerce clause denies states the power to burden the interstate flow of articles of commerce." See Brookman's response, *supra.* (citations omitted) Then, in a "quantum leap of logic," plaintiffs conclude that, "[t]his constitutes a prohibition against treating a domestic corporation differently from a foreign corporation." See *id.*

Plaintiffs further conclude that the legislation *"on its face"* violates this clause by "burden[ing] the interstate flow of *articles of commerce."* (emphasis added)

Upon examination, this argument shows that it has two components: the "on its face" component, and the "articles of commerce" component.

The "on its face" component relies upon the claim that the legislation only regulates the liability of Pennsylvania domestic corporations as compared to non-Pennsylvania corporations. By its very nature, a corporation is a creation of the sovereign state which created it. As the United States Supreme Court stated in *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 89, 107 S.Ct. 1637, 1649 (1987), "State regulation of corporate governance is regulation of entities whose very existence and attributes are a product of state law." This principle has been firmly established in the law from the beginning of constitutional jurisprudence.

"A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created." *Id.,* citing *Trustees of Dartmouth College v. Woodward,* 4 Wheat. 518, 636, 4 L.Ed. 518 (1819).

Accepting this as a fundamental precept that the sovereign state can do no more than regulate its own creation, plaintiffs' attempt to avoid more than superficial scrutiny, by the "on its face" argument, fails. Plaintiffs' corollary argument that the interstate flow of commerce is impacted, upon investigation, also suffers a similar fate.

Plaintiffs argue, without explaining why, that a tort action is an article of commerce. A tort action is the state-created right of a citizen to redress a wrong or a harm suffered by the mechanism of compensatory damages. *Moyer v. Phillips,* 462 Pa. 395, 341 A.2d 441 (1975). Although the term "article of commerce" has been defined in a broad fashion so as to incorporate many diverse aspects of our economy, plaintiffs fail to present any cases, and this court's search fails to uncover any support for the proposition that a tort is an article of commerce. See *e.g., City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531 (1978) (where "garbage waste" was found to be an article of commerce); see *Wyoming v. Oklahoma,* 502 U.S. 437, 112 S.Ct. 789 (1992) (where coal-fueled power production was found to be an article

of commerce). As a consequence, plaintiffs' argument must fail on this point.

Plaintiffs next attempt to implicate the commerce clause by arguing that the silent or negative aspect of the clause is applicable here.

This facet of the commerce clause, known as the "dormant" commerce clause, "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273-74, 108 S.Ct. 1803, 1807 (1988).

Though not specifically stated within the constitutional clause granting the power to regulate commerce to Congress, it has nonetheless long been accepted that the power exists to prevent the individual states from regulating commerce. See *CTS Corp.,* 481 U.S. at 87, 107 S.Ct. at 1650; *Wabash, St. L. & P. Ry. Co. v. Illinois,* 118 U.S. 557, 577, 7 S.Ct. 4 (1886). The test for determining if a challenged regulation affects interstate commerce is by no means clear. *United Waste Systems of Iowa Inc. v. Wilson,* 189 F.3d 762 (8th Cir. 1999). One of the indicia of whether a state regulation more than incidentally impacts interstate commerce, is a protectionist discrimination against foreign companies see *e.g., Wyoming v. Oklahoma,* 502 U.S. 437, 112 S.Ct. 789 (1992), or where the cumulative effect of individual discrimination would burden interstate commerce. See *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377 (1964); *Heart of Atlanta Motel Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348 (1964). When analyzed in its full context, it is clear that the instant legislation does none of the above.

With respect to any individual discrimination, the cast of plaintiffs immediately affected by the legislation include both Pennsylvania residents and non-Pennsylvania residents. In fact, analysis on a case-by-case basis shows that there are 254 Pennsylvania resident plaintiffs which represents 67 percent of the plaintiffs' group and 122 non-Pennsylvania residents, which represents 33 percent of the plaintiffs' group. See appendix "A." Thus, it is clear that both Pennsylvania and non-Pennsylvania residents are both affected without any attempt at distinction.

Plaintiffs' local protectionist argument fares no better when it comes to the companies affected by the legislation. As identified in appendix "A," the galaxy of defendants is extensive. Beginning with the "traditional defendants" and proceeding through to the next level of defendants, it is quite clear that the vast majority of asbestos defendants are not affected by this legislation. This is because their respective liabilities arise from some form of direct culpability as compared to the successor liability alleged here.[7] The challenged legislation makes no distinction between Pennsylvania companies and foreign companies, whose respective liabilities arise out of direct culpability, and this group represents the most significant defendant group. Therefore, the local protectionist argument is unconvincing.

Upon further review of the legislation, it becomes evident that the challenged legislation does not include any

---

7. The plaintiffs implicitly acknowledge the numerical insignificance of the "successor liability" defendants in their argument that this legislation is a "special law." Brookman's response brief, 3/27/2002, p. 11.

protectionist scheme to distinguish between Pennsylvania companies and foreign companies for purposes of exposing the successor assets to liability. Under the legislation, all Pennsylvania companies would have liability up to the level established under the legislation. This is far from erecting the proscribed protectionist barrier. This is the Pennsylvania Legislature's attempt to rationally relate the liability under the successor liability theory to some set of values which are determined by the value of the assets acquired.

This stated purpose, of limiting the liability of some Pennsylvania companies, may have the effect of burdening other asbestos defendants with an increased share of the asbestos liability but this burden would be shared by both Pennsylvania companies and foreign companies whose liabilities arise from direct manufacturing, distributing or other non-successor acquired liability. This fact again fails on its face to erect any local protectionist barriers.

Plaintiffs rely upon *Annenberg v. Commonwealth of Pennsylvania,* 562 Pa. 570, 757 A.2d 333 (1998), and *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531 (1978), to implicate the "dormant commerce clause."

The *Annenberg* case, decided by our Supreme Court, had before it the question whether a tax on stock of foreign corporations, which did not do business in, or have taxable nexus with Pennsylvania, but exempted stock of corporations which did business in, or otherwise had taxable nexus with Pennsylvania, violated the "commerce clause."

The court seemed to make "short work" of the tax law as being facially discriminatory because of how the tax burden was imposed to favor Pennsylvania companies as opposed to foreign companies.

"In examining whether a state law violates the negative commerce clause, we must first determine whether the provision at issue is facially discriminatory. The term 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Annenberg,* 562 Pa. at 575, 757 A.2d at 335. (citations omitted)

Applying the court's test here, the opposite conclusion is easily reached since it is clear that only a small subset of the universe of asbestos defendants is affected, and any resulting increased burden would be shared by Pennsylvania and non-Pennsylvania companies alike. Since the instant legislation is not facially discriminatory, no further analysis is necessary.

Plaintiffs also rely upon *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531 (1978), in which the United States Supreme Court struck down New Jersey legislation that prohibited non-New Jersey waste from being dumped in New Jersey. In its opinion, the court expressed the broad purpose of the commerce clause:

"This principle that our economic unit is the nation, which alone has the gamut of powers necessary to control of the economy, including the vital power of erecting customs, barriers against foreign competition, has as its corollary that the states are not separable economic units." *Id.* at 623, 98 S.Ct. at 2535 (quoting *H.P. Hood & Sons Inc. v. Du Mond,* 336 U.S. 525, 537-38, 69 S.Ct. 657, 665). (internal citations omitted)

The court further expressed the notion of its alertness to the evils of economic isolation and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a state legislates. *Id.* at 623-24. When this legislation is viewed in the larger context, of all the asbestos defendants (see appendix "A" which shows a total of 376 defendants), both domestic and out-of-state, it is clear that this is not the economic isolator the commerce clause was intended to prohibit, but more the incidental effect resulting from the state legislature's attempt to reasonably control successor liability of a sovereign corporation to the value of the asset acquired.

Neither is this the case that was found to exist by the Third Circuit in *Juzwin v. Asbestos Corporation Ltd.,* 900 F.2d 686 (3d Cir. 1990), *cert denied,* 498 U.S. 896, 111 S.Ct. 246 (1990). There, the court invalidated a New Jersey tolling statute that applied to foreign corporations but not to New Jersey corporations.

No such facial discrimination exists here. Any Pennsylvania company whose liability arose from any other action, other than a successor corporation transaction, is not affected. Neither is any foreign company's liability affected differently than any similarly situated Pennsylvania company.

### B. Defendants Counterargue That the Plaintiffs Lack Standing to Challenge the Statute Under the Commerce Clause

Defendant, in its supplemental brief of April 12, 2002, raises the issue of plaintiffs' standing to challenge the

legislation under the dormant commerce clause. See defendant's supplemental brief, 4/12/02, pp. 3-5.

Plaintiffs answer that all that is necessary to establish standing, is that its interests be "substantial," "direct" and "immediate." See plaintiffs' reply to Crown's supplemental brief, 5/2/02, pp. 4-5.

To determine if plaintiffs satisfy any of these criteria, it is helpful to step back and view the action against Crown within the context of the full asbestos litigation.

In each of the complaints in which Crown finds itself a defendant, there are an average of 34 defendants and in some cases, the number of defendants is 116. In the 376 actions here, there are a total of 12,809 defendants. See appendix "A."

If Crown were to be dismissed from each of these actions, the number of defendants decreases by a solitary one. Under the joint tort-feasor concept, all of plaintiffs' damages are recoverable against these remaining defendants. See *Sealover v. Carey Canada*, 791 F. Supp. 1059 (M.D. Pa. 1992), *rev'd on other grounds*, 996 F.2d 42 (3d Cir. 1993).

Within this framed analysis, plaintiffs' interest is neither substantial, nor direct, nor immediate.

But assuming plaintiffs can otherwise meet these burdens, they still fail the standing requirement because they cannot meet the prudential requirements:

"Apart from the constitutional requirements for standing, there is also a set of prudential principles that bear on the question of standing. One such prudential principle is that the plaintiff's complaint must 'fall within the zone of interests to be protected or regulated by the

statute or constitutional guarantee in question.' The so-called 'zone of interests' test 'denies a right of review if the plaintiff's interests are . . . marginally related to or inconsistent with the purposes implicit in the [relevant constitutional provision].' " *Individuals for Responsible Government Inc. v. Washoe County Board of County ·Commissioners,* 110 F.3d 699, 702-703 (9th Cir. 1997), *cert. denied,* 522 U.S. 966, 118 S.Ct. 411 (1997). (internal citations omitted)

Plaintiffs, in their reply brief, speak of the "zone of interest" test and argue that because the legislation will impact them, the standing requirements are met. This simplistic argument fails to recognize the prudential requirement that must be satisfied in order to raise the dormant commerce clause. This requirement is succinctly stated in *Individuals for Responsible Government.*

"To ascertain whether appellants have standing to raise the dormant commerce clause challenge in the present case, it must be determined whether their interests bear more than a marginal relationship to the purposes underlying the dormant commerce clause. The chief purpose underlying that clause is to limit '*the power of the states to erect barriers against interstate trade.*' " *Id.* at 703 (citing *Dennis v. Higgins,* 498 U.S. 439, 446, 111 S.Ct. 865, 970 (1991)). (emphasis added)

Here, the state legislation which attempts to rationally relate state corporations' successor liability to the value of the assets of the acquired corporations, is not even marginally related to the underlying purpose of the commerce clause.

Thus, plaintiffs fail the test for standing to raise the issue of the commerce clause.

But, assuming that standing is established, plaintiff still fails to prove that the legislation violates the commerce clause. Plaintiffs argue that the statute does not provide a liability defense, and therefore summary judgment is not appropriate. This is a non sequitur. The test for when a motion for summary judgment should be granted is well known. Summary judgment may be granted when the pleadings, depositions, interrogatory answers, admissions, affidavits, and expert reports, if any, show that there is no genuine issue as to any material fact and that the record entitles the moving party to judgment as a matter of law. Pa.R.C.P. 1035.1 and 1035.2. All doubts as to the existence of a genuine issue as to a material fact must be resolved against the moving party. *Breslin v. Ridarelli,* 308 Pa. Super. 179, 454 A.2d 80 (1982). The moving party bears the burden of demonstrating that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. *Thompson Coal Company v. Pike Coal Company,* 488 Pa. 198, 412 A.2d 466 (1979). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Curran v. Children's Service Center of Wyoming County Inc.,* 396 Pa. Super. 29, 578 A.2d 8 (1990). The purpose of Pa.R.C.P. 1035 is "to assure that the motion for summary judgment may 'pierce the pleading' and to require the opposing party to disclose the facts of his claim." *Roland v. Kravco Inc.,* 355 Pa. Super. 493, 501, 513 A.2d 1029, 1034 (1986).

Here, it is uncontested that defendant's payments or obligations to make payments well exceed the limit established by the instant legislation, such that relief from

further liability is an issue of law appropriately before the court. See appendix "B." [not published herein]

## II. *The State Constitution Arguments*

### A. Plaintiffs First Claim That the Statute Is Unconstitutional Because It "Retroactively" Extinguishes Claims That Vested Against Crown Before the Statute Was Enacted

The analysis must begin with the presumption that the statute is constitutional. "The proper starting point is the presumption that the legislature does not intend to violate the constitution, and the corollary that a party asserting the unconstitutionality of a legislative act bears a heavy burden of proof." *Bible v. Commonwealth, Department of Labor and Industry,* 548 Pa. 247, 252, 696 A.2d 1149, 1152 (1997) (citing *Bethenergy Mines v. W.C.A.B. (Sadvary),* 524 Pa. 235, 239, 570 A.2d 84, 86 (1990)). "No statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa.C.S. §1926. In examining retroactively applied federal legislation, the United States Supreme Court has stated that, "[e]ven absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Landgraf v. USI Film Products,* 511 U.S. 244, 273, 114 S.Ct. 1483, 1501 (1994).

Our state Supreme Court has held in *Bible, supra,* that the retroactive application of an amendment to the Work-

ers' Compensation Act, specifically, Act 1 of 1995, the Workers' Compensation Act, neither imposed an unconstitutional impairment obligation of contracts, nor did its retroactive application violate due process. There, the amendment to the Workers' Compensation Act actually changed the formula for determining an award of benefits for an injured worker asserting a work-related hearing loss claim.

The amended legislation here reads in part: "business corporation that was incorporated in this Commonwealth prior to May 1, 2001 . . . ." 15 Pa.C.S. §1929.1 (a)(1), (b)(1). The Pennsylvania Legislature saw fit to fashion the statute with the clear and unambiguous language that courts, in reviewing statutory construction, search for when faced with constitutional challenges. The statute reads, in part:

"(d) Application—

"(1) The limitations set forth in subsections (a) and (b) shall apply to mergers or consolidations effected under the laws of this Commonwealth or another jurisdiction consummated prior to May 1, 2001."

The language makes clear that the statute is intended to have a retroactive effect in its application, which is to take place immediately upon its passage. Here, the legislature had established a cap for damages to be applied only to those corporations incorporated before May 1, 2001, and which would normally be liable under the laws of successor liability, even though the corporation did not manufacture, install or sell any asbestos or asbestos-related products. The effect is not an extinguishment of plaintiffs' causes of actions as plaintiffs argue, but rather, a variation of their available remedy. Plain-

tiffs are not without alternative avenues to pursue their remedies. In fact, the average number of defendants in plaintiffs' lawsuits is 34, and under the theory of joint tort-feasor liability, all of plaintiffs' damages are recoverable against the remaining defendants. See *Sealover, supra.*

Moreover, "Neither the federal constitution nor our state constitution invalidates a non-penal statute merely because it is retroactive, unless such legislation impairs contractual or other vested rights." *Jenkins v. Hospital of Medical College of Pennsylvania,* 535 Pa. 252, 262, 634 A.2d 1099, 1104 (1993) (quoting *Barasch v. Pennsylvania Public Utility Commission,* 516 Pa. 142, 532 A.2d 325 (1987), *aff'd,* 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989)). Plaintiffs' potential recovery for damages that are yet to be proved, is not vested.

Plaintiffs rely upon *Gibson v. Commonwealth,* 490 Pa. 156, 415 A.2d 80 (1980), for the proposition that the legislature cannot "constitutionally extinguish a vested cause of action or an accrued claim." Our Supreme Court set for the analysis when it held in *Gibson* that Act 152 could not constitutionally govern claims that accrued before its promulgation.

"It is well-settled that the legislature may not extinguish a right of action which has already accrued to a claimant. This court has consistently held that the legislature's repeal of a law which created a right of action does not disturb any actions accrued thereunder.

"There is a vested right in an accrued cause of action. . . . A law can be repealed by the law giver; but the rights which have been acquired under it, while it was in force, do not thereby cease. . . ." *Id.* at 161, 415 A.2d at 83.

There is no question that the plaintiffs' claims accrued prior to the enactment of the statute in December 2001. In *Gibson,* however, the statute at issue, completely extinguished plaintiffs' claims, thus barring plaintiffs from any recovery. The court finds this case more analogous to what transpired in *Bible, supra,* where the Supreme Court upheld an amendment to the Workers' Compensation Act which merely changed the plaintiffs' remedy. Here, the asbestos plaintiffs' claims will continue through the litigation and should plaintiffs succeed in proving the liability portion of their claims, they will then be required to prove the damages aspect of their claims. Plaintiffs will only be entitled to recover damages against the remaining defendants if they are able to prove that the negligence of the defendants was a cause, in fact, of their damages. Retrospective laws are permitted "when they impair no contract and disturb no vested right, but only vary remedies, cure defects in proceedings otherwise fair and do not vary existing obligations contrary to their situation when entered into and prosecuted." *Humphreys v. DeRoss,* 567 Pa. 614, 618 n.3, 790 A.2d 281, 284 n.3 (2002) (quoting *Brangs v. Brangs,* 407 Pa. Super. 43, 49-50, 595 A.2d 115, 119 (1991)).

Finally, defendant, in its motion cites *Smith v. Fenner,* 399 Pa. 633, 161 A.2d 150 (1960), in which the court upheld the retroactive application of the amendment to the Uniform Contribution Among Tort-feasors Act, which became effective 13 months after the cause of action occurred. Along with *Bible, supra,* this case provides more persuasion for the retroactive application of the statute being challenged here, and therefore, plaintiffs'

claims that the statute is unconstitutional because it arguably "extinguishes" plaintiffs' vested claims fails.

### B. Plaintiffs Argue That the Statute Sets an Unconstitutional Limit on Personal Injury Damages Which Plaintiffs May Recover

Plaintiffs invoke Article 3 Section 18 of the Pennsylvania Constitution in seeking to have the Act declared unconstitutional because it limits the amount of damages recoverable in personal injury action. See Brookman's response brief, *supra*, p. 10.

Article 3, Section 18 states that: "The General Assembly may enact laws requiring the payment . . . but in no other cases shall the General Assembly limit the amount to be recovered for injuries resulting in death, or for injuries to persons or property, and in case of death from such injuries, the right of action shall survive, and the General Assembly shall prescribe for whose benefit such actions shall be prosecuted. . . ." Pennsylvania Constitution, Article 3, Section 18. However, this section does not confer a right of recovery where none otherwise exists. *Jackman v. Rosenbaum Co.,* 263 Pa. 158, 106 A. 238 (1919).

On its face, the Act says nothing about any such individual limitations. Further, there can be no logical inference that plaintiffs' recovery will be diminished in any way. In the 376 cases included in this motion, there are over 7,000[8] defendants being sued, all of whom are sub-

---

8. This number was arrived at by adding the number of defendants in each of the 376 cases, recognizing that the same defendants may be named repeatedly in the civil actions listed in appendix "A."

ject to joint tort liability. See *Sealover,* 791 F. Supp. 1059 (M.D. Pa. 1992).

The plaintiffs argue that the statute constitutes a denial of equal protection because it "discriminates against out-of-state corporations." See Brookman's response brief, *supra,* p. 9.

As has been often repeated in this opinion, only Pennsylvania companies with successor liability are directly impacted by this legislation. The incidental effects of removing Crown as a defendant are shared by Pennsylvania companies and foreign companies alike. Because of this factual distinction, the argument fails.

In considering the legal aspect of this argument, the test to be applied was best stated by our Supreme Court in a case where it struck down a Pennsylvania statute that extinguished defamation torts upon the death of a plaintiff.

"The Equal Protection Clause of both constitutions does not deny the state the power to treat different classes of persons in different ways, but does deny the right to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of the particular statute. The classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation so that all persons similarly circumstanced shall be treated alike." *Moyer,* 462 Pa. 395, 400-401, 341 A.2d 441, 443 (1975).

In *Moyer,* the Supreme Court focused on the wholly arbitrary distinction between types of torts which were

allowed to survive plaintiff's death and those that were not. Here, in direct contrast to the situation in *Moyer*, is the circumstance of a legislatively enacted statute that rationally relates the financial liability of a successor corporation to the value of acquired assets. Clearly, the classification of a successor Pennsylvania corporation which exists under the authority of the sovereign state, as against all other defendant corporations, is the objective of the statute and the classification is not arbitrary, but rather, necessary.

## C. Plaintiffs Argue That the Statute Is Unconstitutional Under Article 3, Section 32 Prohibiting Enactments of "Special Laws"

Plaintiffs claim that the statute is unconstitutional on the grounds that it violates Article 3, Section 32 of the Pennsylvania Constitution which prohibits the passage of "special laws." Section 32 reads: "The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special laws . . ." Pennsylvania Constitution, Article 3, Section 32.

Both the Brookman and Paul briefs make this argument for plaintiffs.

In discussing these issues, the court will follow in the footsteps of Justice Zappala in *Pennsylvania Liquor Control Board v. Spa Athletic Club*, 506 Pa. 364, 369, 485 A.2d 732, 734 (1984).

"We have held that the equal protection clause and the prohibition of special legislation are substantially simi-

lar, *Baltimore & Ohio Railroad Co. v. Commonwealth, Department of Labor and Industry,* 461 Pa. 68, 334 A.2d 636 (1975), and therefore will treat them together in our discussion of the constitutional issue."

Although the factual context of this legislation has been previously set forth, it bears repeating for this argument.

It is uncontested that only a class of Pennsylvania corporations with successor liability is the subject of this legislation. The incidental effects of removing Crown as a defendant are shared by Pennsylvania companies and foreign companies alike. The factual distinction standing alone is sufficient to refute plaintiffs' "denial of equal protection" argument based upon alleged "discrimination against foreign corporations," since it is clear that no such discrimination factually exists.

Plaintiffs point to five distinctions or classifications of business entities inherent in this legislation. They say that such distinctions serve to make a class so unique as to qualify as a special law.

Upon review of appendix "A," there are 7,293 Pennsylvania corporations. Plaintiffs fail to demonstrate any evidence that out of these Pennsylvania defendants, other defendants do not now belong to the class or may someday enter the class.

The operative principle has long been the law in Pennsylvania. In 1874, when the Pennsylvania Legislature implemented the classification of cities, it was then argued that the classification of the City of Philadelphia, as the only city of the first class, was "local and special." See *Wheeler v. Philadelphia,* 77 Pa. 338 (1875 WL 12964). In upholding the constitutionality of the classi-

fication, the Supreme Court found that since the legislature created a class which others might join, it could not be considered local or special.

Moreover, in *Seabolt v. Commissioners,* 187 Pa. 318, 323, 41 A. 22, 23 (1898), the court stated:

"Legislation for a class distinguished from a general subject is not special but general, and classification is a legislative question, subject to judicial revision only so far as to see that it is founded on real distinctions in the subjects classified, and not on artificial or irrelevant ones, used for the purpose of evading the constitutional prohibition. If the distinctions are genuine, the courts cannot declare the classification void, though they may not consider it to be on a sound basis. The test is, not wisdom, but good faith in the classification."

In reviewing this challenge to the legislation, it is important to review the standard by which this court proceeds.

"The strong presumption of constitutionality enjoyed by acts of the General Assembly and the heavy burden of persuasion on the party challenging an Act have been so often stated as to now be axiomatic. Legislation will not be invalidated unless it clearly, palpably, and plainly violates the constitution, and any doubts are to be resolved in favor of a finding of constitutionality. . . . It is not necessary that the rational basis for a classification be set forth in the statute or in the legislative history. Nor is it necessarily incumbent upon the government agency to advance the reasons for the Act in defending the classification. The burden must remain upon the person challenging the constitutionality of the legislation to demonstrate that it does not have a rational basis. Should the

reviewing court detect such a basis, from whatever source, the legislation must be upheld." *Pennsylvania Liquor Control Board,* 506 Pa. at 370-71, 485 A.2d at 735.

"Classifications in the area of commercial regulation are normally tested against the rational basis principle." *Id.* at 369, 485 A.2d at 734, citing *City of New Orleans v. Dukes; Allied Stores of Ohio Inc. v. Bowers; Williamson v. Lee Optical of Oklahoma.* (internal citations omitted)

"Likewise, our interpretations of the special legislation provision of the Pennsylvania Constitution have given wide latitude to commercial regulation." *Id.* at 370, 485 A.2d at 734-35.

Here, given the actual number of Pennsylvania defendants who may qualify and the lack of contrary evidence, and the clearly expressed basis for the legislation, that is, the limiting of liability of an asbestos defendant under a successor liability theory to the acquired assets, the legislation fails the test for a special law and passes the rational basis test.

### D. Plaintiffs Claim That the Statute Is Unconstitutional As It Violates Article 3, Section 1 and Section 3 in That the Legislation Was Improperly Enacted

Plaintiffs' final argument is that the statute is unconstitutional in that it violates Article 3, Section 1 and Section 3. Section 1 reads: "Passage of laws. No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either house, as to change its original purpose." Pennsylvania Constitution,

Article 3, Section 1. Section 3 reads: "Form of bills. No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof. Amended May 17, 1967." Pennsylvania Constitution, Article 3, Section 3.

"[W]hen a law has been passed and approved and certified in due form, it is no part of the duty of the judiciary to go behind the law as duty certified to inquire into the observance of form in its passage. . . . The presumption in favor of regularity is essential to the peace and order of the state." *Common Cause/Pennsylvania v. Commonwealth,* 710 A.2d 108, 116-17 (Pa. Commw. 1998), *affirmed,* 563 Pa. 108, 757 A.2d 917 (2000). (citation omitted)

However, the Supreme Court went on to say in *Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 178, 507 A.2d 323, 333 (1986), that, "While it is appropriate to give due deference to a co-equal branch of government as long as it is functioning within constitutional constraints, it would be a serious dereliction on our part to deliberately ignore a clear constitutional violation."

The purpose of Article 3, Section 1 is to "put the members of the [General] Assembly and others interested on notice so that they [may act] with circumspection." *Common Cause/Pennsylvania v. Commonwealth,* 710 A.2d 108, 119 (Pa. Commw. 1998), *affirmed,* 563 Pa. 108, 757 A.2d 917 (2000) (quoting *Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 179-80, 507 A.2d 323, 335 (1986)).

Plaintiffs argue that the enactment of the bill was constitutionally flawed as a result of amendment after its original Senate approval. See Brookman's response brief, *supra,* p. 11.

The history of the passage of the bill is adequately set forth in Brookman's response brief, and is not reiterated here.

In order to prevail in the argument, plaintiffs must overcome significant obstacles to invalidate an Act of the legislative branch of government on constitutional grounds. See *Pennsylvania Liquor Control Board.* These obstacles begin with title 1, section 1922(3) of the Pennsylvania Consolidated Statutes:

*"Section 1922—Presumptions in ascertaining legislative intent*

"(3) That the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth." 1 Pa.C.S. §1922(3).

The heavy burden of persuasion which is imposed upon the challenging party is given form by requiring such party to clearly demonstrate that the violation is plain and palpable, and any doubts shall be resolved in favor of a finding of constitutionality. See *Pennsylvania Liquor Control Board* at 370, 485 A.2d at 735.

Plaintiffs' argument implicates Sections 1 and 3 of Article 3 of the Pennsylvania Constitution which requires that no bill "shall be altered or amended, on its passage through either house, as to change its original purpose" (Section 1), and that "no bill shall be passed containing more than one subject, which shall be clearly expressed in its title" (Section 3).

It is uncontested that this Act qualifies under the Enrolled Bill Doctrine. Once this has been established, "it is no part of the duty of the judiciary to go behind the law as duly certified to inquire into *the observance of form* in its passage. . . . The presumption . . . of regularity is essential to the peace and order of the state." *Common Cause/Pennsylvania,* 710 A.2d at 116-17. (citations omitted)

In arriving at its conclusion, Judge Kelley, writing on behalf of the Commonwealth Court of Pennsylvania, set forth in an excellent opinion, what should be the operative tests for invalidating legislation under Sections 1 and 3 of Article III of our Constitution.

"Petitioners allege that the General Assembly violated Article III, Section 1 of the Pennsylvania Constitution by so amending HB 67 on its passage through the General Assembly as to change its original purpose. We disagree.

"Article III, Section 1 of the Pennsylvania Constitution provides that no bill shall be so altered on its passage through either house as to change its original purpose. In discussing Article III, Section 1 of the Pennsylvania Constitution, our Supreme Court has stated that the purpose of the constitutional requirements relating to the enactment of laws 'was to put the members of the Assembly and others interested on notice so they might vote on it with circumspection.' " *Id.* at 119 (quoting *Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 179-80, 507 A.2d 323, 335 (1986)).

"Article III, Section 3 of the Pennsylvania Constitution provides that no bill shall contain more than one subject, which shall be clearly expressed in the title of

the bill. Our Supreme Court has stated that, pursuant to Article III, Section 3, a title is constitutional if it puts a reasonable person on notice of the general subject matter of the Act. *In re Department of Transportation,* 511 Pa. 620, 626, 515 A.2d 899, 902 (1986). Article III, Section 3 of the Pennsylvania Constitution does not require a title to be an index or synopsis of an Act's contents. *Id.* at 627, 515 A.2d at 902. One who seeks to declare a title unconstitutional under Article III, Section 3 must demonstrate either that: (1) the legislators and the public were actually deceived as to the Act's contents at the time of passage; or (2) the title on its face was such that no reasonable person would have been on notice as to the Act's contents. *Id.*" *Id.* at 120.[9]

Here, plaintiffs have failed to offer any evidence that these requirements were satisfied.

Plaintiffs rely upon another *"Common Cause"* captioned case as support for its position. In *Common Cause of Pennsylvania v. Commonwealth,* 668 A.2d 190 (Pa. Commw. 1995), *affirmed,* 544 Pa. 512, 677 A.2d 1206 (1996), the Commonwealth Court had before it a constitutional challenge under various provisions of the Pennsylvania Constitution under Article 3, Sections 1, 2, 3, 4, 11, 29 and 30.

In beginning its analysis in *Common Cause* (1995), the Commonwealth Court, per then President Judge Colins, cites at length from the same *Consumer Party* case cited above regarding the test to be followed in these

---

9. Because the two cases cited herein are similarly captioned, for reference purposes, they will be referred to as *Common Cause* (1995) and *Common Cause* (1998).

type challenges. *Id.* at 196. The obvious purpose for this is to explain the standard for analysis for non-appropriation bills. The court then goes on to explain why the appropriation bill is fatally flawed in its implementation. Part of the explanation involves the role of Article 3, Section 11:

"Therefore, unlike non-appropriation bills, we have held that Article III, Section 11 imposes *certain unique strictures* on the legislature when enacting a general appropriation Act. In fact, our Supreme Court has recognized that the 'evils attendant' in excluding general appropriation bills from the single subject requirement of Article III, Section 3 are minimized by the restrictions imposed by Article III, Section 11 upon the content of such bills." *Id.* at 197. (emphasis added) (citation omitted)

Because the bill under challenge in *Common Cause* (1995) began as a bill originally containing *only* an appropriation from a restricted account in the general fund to the PUC into the GAA (General Appropriations Act), the Act was determined to have violated the Pennsylvania Constitution, Article III, Section 1. *Id.*

*Common Cause* (1995) is sufficiently distinguished on this basis. Considering this, plaintiffs have failed to carry the "burden of persuasion" that the non-appropriations Act of the legislature is unconstitutional.

Therefore, upon consideration of defendant Crown's motion for summary judgment, and all responses thereto, as well as the parties' supplemental briefs, it is hereby ordered that summary judgment in favor of defendant is granted.

## ORDER

And now, to wit, June 11, 2002, it is hereby ordered and decreed that the motion for summary judgement filed by defendant Crown, Cork and Seal, is granted. Defendant Crown, Cork and Seal only is dismissed from the 376 captioned cases found in appendix "A" to these findings and order.

---

## APPENDIX "A" SUMMARY

| | |
|---|---|
| Number of plaintiffs—Pennsylvania residents | 254 |
| Number of plaintiffs—Non-Pennsylvania residents | <u>122</u> |
| *Total plaintiffs* | *376* |
| Number of defendants—Pennsylvania residents | 7347 |
| Number of defendants—Non-Pennsylvania residents | <u>5462</u> |
| *Total defendants* | *12,809* |

Average number of defendants = 33.65

Note:

Total defendants—This number includes a duplication of defendants since many of the same defendants are sued in each case.