# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00518-CV

**Rosemarie Satterfield, as Representative of the Estate of
Jerrold Braley, Deceased, Appellant**

**v.**

**Crown Cork & Seal Company, Inc., Individually and as Successor to
Mundet Cork Corporation, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
## NO. GN403145, HONORABLE PETER M. LOWRY, JUDGE PRESIDING

## D I S S E N T I N G   O P I N I O N

After careful consideration of the record and extensive analysis of the governing legal authority—including that which is proffered as support for conclusions in the majority opinion—I believe that Satterfield has not met her heavy burden of demonstrating that chapter 149, as applied to her case, violates article I section 16 of the Texas Constitution, and I respectfully dissent. The presumption of constitutionality that is afforded to chapter 149 cannot be overcome without showing that the statute abrogated a vested right, that it deprived Satterfield of all remedy for her claims, and that it was an improper exercise of legislative police power. The majority opinion is fundamentally flawed because (1) it does not discern that Satterfield's successor-liability theory against Crown was neither a cause of action nor a vested right, (2) it favors Pennsylvania law over

Texas law on the availability of Satterfield's remedy, and (3) it does not recognize the legislature's right to reasonably exercise its police power after balancing the competing considerations on its own.

Additionally, because Satterfield did not demonstrate that chapter 149 is a special law that violates article III section 56 of the Texas Constitution and because Crown conclusively established its affirmative defense limiting its post-merger successor liability, I would affirm the trial court's judgment. I write separately for full discussion of the issues presented in this appeal.

**Overview**

A major development in the proliferation of asbestos litigation, the "longest-running mass tort litigation in the United States,"[1] has been the increased involvement of defendants who were not major manufacturers or distributors of asbestos. *In re Joint E. & S. Dists. Asbestos Litig.*, 237 F. Supp. 2d 297, 300 (E.D.N.Y. 2002). Defendants in asbestos litigation are no longer confined to a core group of companies who processed asbestos or used it extensively. *Id*. at 305. Instead, the pursuit of solvent defendants has led to the involvement of over 6,000 companies, in virtually every type of American industry, whose connection to asbestos is attenuated. *Id*.

That trend is evident in this case, in which Braley sued numerous corporations including Crown[2] in Texas,[3] seeking damages for injuries that he attributed to his exposure to

---

[1] *In re Abestos Litigation*, 59 Pa. D. & C.4th 62, 65 (Pa. Ct. Cm. Pl. 2002), *rev'd on other grounds*, *Ieropoli v. AC&S Corp.*, 842 A.2d 919 (Pa. 2004).

[2] Crown was a New York-based company when it merged with Mundet, but it has been incorporated in Pennsylvania since 1989.

[3] Braley chose to file suit in Travis County, even though he had lived in Wyoming for over twenty years and alleged that he was exposed to asbestos-containing products in five states, including the state of his residence. He was never an Austin or Travis County resident. Venue in this case

2

asbestos-containing products.[4]   Although Crown itself never manufactured, sold, or distributed asbestos-containing products, it was the successor by merger to a corporation that did: Mundet. Because of its merger with Mundet, Crown has been named in more than 20,000 successor-liability cases in Texas alone. *See, e.g.*, *Robinson v. Crown Cork & Seal Co.*, 251 S.W.3d 520, 538 n.12 (Tex. App.—Houston [14th Dist.] 2006, pet. granted). The record reflects that through May 2003, Crown had already paid asbestos-related claims totaling more than $413 million.

### 1966 Crown-Mundet merger

The successor-liability theory Satterfield asserts against Crown is based on its merger with Mundet more than four decades ago. Mundet had a thermal-insulation division that manufactured, sold, and installed asbestos products before 1963. Mundet also had a "closure" division, which was not involved with asbestos at all. The closure division, like Crown, manufactured and sold metal bottle caps lined with cork, known in the industry as "crowns." Crown sought to acquire Mundet's closure division. After being informed that the closure division would not be sold separately, Crown purchased a majority of Mundet stock for approximately $7 million on November 13, 1963. Mundet had ceased manufacturing insulation products during the summer before Crown's stock purchase.

---

was based on the principal office of one defendant who had already provided a settlement. Given these facts, Crown correctly noted that the relationship between Braley's suit and the state of Texas was "tenuous."

[4] Braley smoked a pack of cigarettes daily since the age of fourteen. Against his physicians' advice, he continued to smoke, even after his cancer diagnosis and his lawsuit's filing.

Immediately after the stock purchase and at Crown's request, Mundet began looking for a purchaser for the insulation division. Mundet sold the insulation division within ninety days, on February 8, 1964, to a manufacturer and seller of asbestos-containing insulation products, Baldwin-Ehret-Hill, Inc. ("B-E-H"). As part of the purchase agreement, B-E-H acquired the books, records, employees, equipment, finished goods, trademarks, licenses, raw material, and post-purchase liabilities of Mundet's insulation division. In 1966, two years after B-E-H purchased Mundet's insulation division, Crown and Mundet merged.[5]

Based on this merger, Braley filed a motion for partial summary judgment asserting that "Crown Cork [wa]s responsible for the products and conduct of Mundet Cork, which it acquired through merger."[6] The trial court granted the motion, imposing liability on Crown for damages caused by asbestos-containing products that were manufactured, sold, or distributed before February 8, 1964, by Mundet.

### Enactment of chapter 149

Recognizing that successor corporations could be bankrupted by liability for asbestos-related injuries that they did not cause and recognizing the risks to Texas jobs and pensions, the

---

[5] The majority assumes that Crown acquired all of Mundet's pre-merger liabilities. Nowhere in the certificate of merger does Crown assume any liabilities of Mundet.

[6] Crown's response to Braley's motion for partial summary judgment clarified that when a Wyoming resident files a lawsuit against a Pennsylvania corporation in a Texas court, Texas choice-of-law rules apply. Moreover, Crown noted that the tort liability in this case was based on the alleged torts of Mundet—Crown was not a "bad actor" but an innocent successor corporation. The parties disputed whether the punitive damages issue should be governed by Pennsylvania or New York law. However, because statutes from either state provided that Crown would have succeeded to Mundet's compensatory liability, the lack of contest to such liability is unsurprising.

legislature enacted the liability limitation in chapter 149 of the civil practice and remedies code on June 2, 2003. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 149.001-.006; *see also* H.J. of Tex., 78th Leg., R.S. 6042-43 (2003). The statute was made applicable to domestic corporations that were organized under Texas law, and to foreign corporations—like Mundet and Crown—organized under the law of another jurisdiction. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 149.001(2); .002.

Under the statute, a successor corporation that had paid claims equivalent to the statutory limit would remain liable only for certain types of claims or if the successor continued the business of manufacturing, selling, or distributing asbestos-containing products after the merger. *Id*. § 149.002(b) (providing that liability limitations in section 149.003 do not apply to certain claims, including those for workers' compensation, premises liability, and pending settlement contracts for asbestos claims; or to successors who continue business of mining asbestos, or manufacturing, selling, or distributing asbestos-containing products after merger or consolidation). Here, the record reflects that by mid-2003, Crown had already paid cumulative asbestos-related liabilities over $413 million—more than six times the statutory limit.

The legislature also codified a choice-of-law provision in chapter 149 that made Texas law applicable to every successor-liability suit filed in the state, even if the issue of post-merger liability would have otherwise been governed by another state's law under choice-of-law rules such as the common law "most significant relationship" test.[7] *Id*. § 149.006.

---

[7] Texas courts use the Restatement's "most significant relationship" test to decide choice-of-law issues, applying the law of the state with the most significant relationship to the particular issue to be resolved. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2001); *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 204 (Tex. 2000); Restatement (Second) of Conflict of Laws §§ 6, 145 (1971).

Additionally, the legislature expressly provided that chapter 149 would become "effective immediately" in all cases commenced on or after June 11, 2003. *See* Act of June 2, 2003, 78th Leg., R.S., ch 204, § 17.02, 2003 Tex. Gen. Laws 895; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 149.001 (referencing historical note that designates June 11, 2003, as statute's effective date). Cases pending as of June 11, 2003, have chapter 149 applied to them.[8] *Id.* (mandating application of chapter 149 to all cases "in which the trial, or any new trial or retrial following motion, appeal, or otherwise, begins on or after that effective date."). Because this suit against Crown was pending on June 11, 2003, and set for trial on November 3, 2003, chapter 149 applied to it.

---

[8] It is undisputed that the legislature intended chapter 149 to apply to pending cases. That clear legislative intent would be a decisive factor in upholding the constitutionality of the statute if it were scrutinized only under analogous federal law. The Supreme Court held that the judiciary's first task when considering a case that challenges a statute enacted after the events in suit is to determine whether Congress has expressly prescribed the statute's proper reach:

> If Congress has done so [expressly prescribed the statute's proper reach], of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect . . . . If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result."

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994); *see also Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (quoting *United States v. St. Louis, San Francisco & Tex. Ry. Co.*, 270 U.S. 1, 3 (1926)) (holding that "a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication"); Tex. Gov't Code Ann. § 311.022 (West 2005) ("A statute is presumed to be prospective in its operation unless expressly made retroactive."); *cf. Johns-Manville Sales Corp. v. R. J. Reagan Co.*, 577 S.W.2d 341 (Tex. Civ. App.—Waco 1979, writ ref'd n.r.e.) (invalidating statute that lacked any provision making it expressly retroactive).

**No vested right in successor-liability remedy**

Successor liability issues are fact-intensive—given the "myriad factual circumstances and legal contexts in which it can arise," the Supreme Court has noted that "an emphasis on the facts of each case as it arises is especially appropriate." *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 256 (1974). The majority veers from any analysis of the facts that inform the vested-rights issue and in doing so, confuses a theory of successor-liability against Crown with a cause of action against Mundet.[9] It states that "the question presented is whether an accrued and pending common law cause of action is a vested right and thus protected by the Texas Constitution." But what follows that statement is an analysis of vested rights in a vacuum. Nowhere does the majority opinion identify what "cause of action" or which "common-law claims" against Crown have supposedly vested. There were none. As the summary-judgment evidence in this record demonstrates, Crown itself never manufactured, sold, or distributed asbestos-containing products, and Braley was not injured by any act or omission on the part of Crown.[10] *Cf. Barker v. Eckman*, 213 S.W.3d 306, 311 (Tex. 2006) ("This Court has consistently held that a cause of action accrues when a party has been injured by actions or omissions of another.").

---

[9] The majority's discussion of vested rights in this as-applied challenge leaves significant questions unanswered with regard to Crown: What were Braley's accrued causes of action or common-law claims against Crown? What duty was owed to Braley by a corporation that never manufactured, sold, or distributed asbestos-containing products? What theory of recovery permits Braley to seek damages from Crown? What "validly vested rights" did Braley have against Crown that were affected by chapter 149?

[10] The majority discerns no dispute between the parties that "the causes of action Braley asserted against Crown Cork accrued prior to the Statute's enactment." Review of the record and briefing show otherwise, as Crown has consistently maintained that it was sued as Mundet's successor and that the causes of action alleged in this case accrued against the alleged tortfeasor, Mundet.

7

The successor-liability theory does not create a cause of action. *In re Fairchild Aircraft Corp.*, 184 B.R. 910, 920, 921 n.11(Bankr. W.D. Tex. 1995), *vacated on other grounds*, 220 B.R. 909 (Bankr. W.D. Tex. 1998); *see National Architectural Prods. Co. v. Atlas-Telecom Servs.*, No. 3:06-CV-0751-G ECF, 2007 U.S. Dist. LEXIS 51182, at *34 (N.D. Tex. 2007) (noting that issue of whether sale-of-assets agreement subjected corporate defendant to successor liability was not one sounding in tort). The theory merely allows for the transfer of liability from the predecessor to the successor. *In re Fairchild Aircraft Corp.*, 184 B.R. at 920, 921 n.11; *see Griggs v. Capitol Mach. Works, Inc.*, 690 S.W.2d 287, 289 (Tex. App.—Austin 1985, writ ref'd n.r.e.) (noting that liability sought to be imposed against successor corporation was vicarious because it was not based on any act or omission by successor but on its imputed liability for act or omission of dissolved predecessor corporation); *see also R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630, 636 (S.D.N.Y. 1995) (characterizing successor liability as "fundamentally a form of secondary, vicarious liability imposed upon an innocent party"). Successor liability supplies the claimant with a remedy when a predecessor corporation ceases to exist—e.g., because of a dissolution or merger—and cannot be sued. *See White v. Cone-Blanchard Corp.*, 217 F. Supp. 2d 767, 774 n.1 (E.D. Tex. 2002). Here, it allows Crown to be considered a "tortfeasor" by virtue of its merger with Mundet.

Thus, the successor-liability theory is the procedural remedy that makes recovery possible for the torts Satterfield has attributed to Mundet, from whom she would otherwise have no recovery at all. The precise question presented to this Court is whether Satterfield had a vested right to that successor-liability remedy against Crown under the Texas Constitution. After considering

the parameters of a "vested right" that receive constitutional protection and applying them to the facts of this record, I am persuaded that she did not.

### *Vested rights are certain and immediately enforceable*

In her first issue, Satterfield contends that chapter 149 retroactively impaired a vested right. Vested rights are property rights, which the constitution protects like any other property. *Subaru, Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002) (citing *Middleton v. Texas Power & Light Co.*, 185 S.W. 556, 560 (Tex. 1916)). Article I, section 16 of the Texas Constitution, which prohibits the enactment of retroactive laws, protects vested rights by excluding them from the reach of subsequently enacted legislation. *See* Tex. Const. art. I, § 16. Statutes that do not affect a claimant's vested rights, however, are not shielded by article I, section 16. *State v. Project Principle, Inc.*, 724 S.W.2d 387, 390 (Tex. 1987) (stating that laws are deemed retrospective and constitutionally prohibited if their retrospective operation destroys or impairs vested rights); *De Cordova v. City of Galveston*, 4 Tex. 470, 479-80 (Tex. 1849) (same); *see also Corpus Christi People's Baptist Church v. Nueces County Appraisal Dist.*, 904 S.W.2d 621, 626 (Tex. 1995) (concluding that provision in tax code allowing exemption to be established after taxes were assessed was not retroactive law because taxing unit had no vested right to taxes until determination of exemption). Thus, in the absence of a constitutional prohibition, the legislature may change statutory or common law, but in so doing, it may not deprive a person of a property right acquired under existing law. *Aetna Ins. Co. v. Richardelle*, 528 S.W.2d 280, 284 (Tex. Civ. App.—Corpus Christi 1975, writ ref'd n.r.e.).

9

Whether a particular right is vested is a difficult question, *Grocers Supply Co. v. Sharp*, 978 S.W.2d 638, 643 (Tex. App.—Austin 1998, pet. denied), but a key characteristic of a vested legal right is its immediate legal enforceability. *See Mellinger v. Houston*, 3 S.W. 249, 253 (Tex. 1887); *see also Corpus Christi People's Baptist Church*, 904 S.W.2d at 626. The Texas Supreme Court explained that "a right, in a legal sense, exists, when in consequence of given facts the law declares that one person is *entitled to enforce* against another a claim or to *resist the enforcement* of a claim urged by another." *Mellinger*, 3 S.W. at 253 (emphasis added); *see also Corpus Christi People's Baptist Church*, 904 S.W.2d at 626 (noting that taxes that were due on receipt and became delinquent next year if unpaid, represented liability "for which the taxing unit may enforce collection"). The court further defined "rights" as "well-founded claims," meaning those claims that are "recognized or secured by law." *Mellinger*, 3 S.W. at 253. Demonstrating its definition of vested rights, the court in *Mellinger* struck a statute that was enacted after a taxpayer's suit was filed, barring the taxpayer's defense of limitations to a city's tax collection suit. *See* 3 S.W. at 249-251. Determinative considerations for the *Mellinger* court were the lack of any suggestion that the legislature intended to make the law applicable to pending cases and the taxpayers' right to rely on the defense of limitations, which vested on the expiration of the limitations period and prevented the city's tax claim from being enforced. *See id*. at 251-53.[11]

---

[11] In attempt to characterize Satterfield's successor-liability theory against Crown as a vested right, the majority relies heavily on a line of cases concluding that, after the expiration of time required by a statute of limitations, the legislature cannot abrogate a defendant's vested right to assert a limitations defense. *See, e.g.*, *Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex. 1999); *Mellinger v. Houston*, 3 S.W. 249, 253 (Tex. 1887); *De Cordova v. City of Galveston*, 4 (Tex. 470, 479-80 (Tex. 1849). Those are not the facts of this case.

10

Echoing these considerations of legal enforceability, Texas courts have held that vested rights are those that imply an immediate right or an entitlement—those that are not based upon mere expectation or contingency. *See City of Dallas v. Trammell*, 101 S.W.2d 1009, 1014 (Tex. 1937); *Walls v. First State Bank of Miami*, 900 S.W.2d 117, 121 (Tex. App.—Amarillo 1995, writ denied); *Houston Indep. Sch. Dist. v. Houston Chronicle Publ'g Co.*, 798 S.W.2d 580, 589 (Tex. App.—Houston [1st Dist.] 1990, writ denied); *see also Attorney General of Tex. v. Redding*, 60 S.W.3d 891, 893 (Tex. 2001) (noting that defendant's right to rely on statute of limitations vests when limitations period expires); *Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex. 1999) (same).

### *Choice-of-law rules are alterable*

The majority suggests that chapter 149 disrupted Satterfield's settled expectations in this case. It did not. Satterfield lacked any immediate entitlement or legally enforceable right to impose successor liability on Crown. Her successor-liability remedy depended entirely on the application of New York law through choice-of-law rules and those rules may be altered by statute in the same manner as other Texas law. *See Owens Corning v. Carter*, 997 S.W.2d 560, 574 (Tex. 1997) (recognizing that courts may make reasoned adjustments in legal system); *see also*

---

Moreover, the holdings in those cases would contradict the majority's suggestion that a claimant has a vested right to a statutory remedy immediately upon filing suit. This is because merely filing suit would not decide the legal enforceability or entitlement to the relief sought by the claimant. For example, if a suit were filed after the expiration of a limitations period, the defendant would have an immediate, legally recognized right under Texas law to dismissal of the suit on limitations grounds, and that right could not be defeated by the claimant's assertion of a competing "vested interest" based solely on the suit's filing.

Restatement (Second) of Conflict of Laws § 5 (choice-of-law rules are as open to reexamination as any other common-law rules), 5 William V. Dorsaneo III, *Texas Litigation Guide* § 62.01 [1] (2007) (same).

Texas law did not impose successor liability based on the merger of two foreign corporations—those incorporated outside Texas—until chapter 149 was enacted. *See* Tex. Bus. Corp. Act Ann. art. 1.02 (14) (defining "foreign corporation" as "a corporation for profit organized under laws other than the laws of this State"), (18) (West Supp. 2006) (defining "merger" as division of domestic corporation into two or more new domestic corporations, or into surviving corporation and at least one new domestic corporation, or combination of one or more domestic corporations with other entities). Mundet and Crown were considered "foreign corporations," because they were incorporated in a state other than Texas. *See id*. art. 1.02(11) (West Supp. 2006) (defining "domestic corporation" to exclude "foreign corporation"), (14).[12] When this suit was filed against Crown, Texas courts had to apply the law of the state with the "most significant relationship" to the merger to determine which state's law should apply and whether that state's law would provide for the imposition of successor liability. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848-49 (Tex. 2001) (elaborating on "most significant relationship" test set forth in sections 6 and 145 of Restatement (Second) of Conflict of Laws for determining choice-of-law issues).

Mundet and Crown were incorporated in New York when they merged, and their certificate of merger was filed in New York pursuant to New York law. Using the most-

___

[12] These definitions remain unchanged from the 2003 version in effect when Braley sought partial summary judgment to establish Crown's liability as Mundet's successor.

significant-relationship test, the trial court determined that New York law should apply to the issue

of successor liability. It also determined that New York law provided for the imposition of successor

liability against Crown.[13] *See* N.Y. Bus. Corp. Law Ann. § 906(b)(3) (McKinney 2003) ("[t]he

surviving . . . corporation shall assume and be liable for all the liabilities . . . of the constituent

entities. No liability . . . , claim or demand for any cause existing against any such constituent entity

. . . shall be released or impaired by such merger"). Accordingly, the court granted Braley's motion

for partial summary judgment on the issue of liability.

However, the enactment of chapter 149's choice-of-law provision, requiring courts

to apply Texas law to the issue of successor asbestos-related liabilities, superseded the common

law's most-significant-relationship test and rendered New York law inapplicable to this suit.[14] *See*

---

[13] Satterfield argued that the trial court's choice of law was irrelevant because the successor-liability law was the same in Texas as in New York. She noted that article 5.06 of the Business Corporation Act states that the surviving company "inherits the liabilities of its predecessors" after merger. *See* Tex. Bus. Corp. Act Ann. art. 5.06 (West 2003). Her reliance on article 5.06 is misplaced. That article applies only to a merger involving at least one domestic corporation organized under Texas laws, and neither Crown nor Mundet were domestic corporations. *See id.* art. 1.02(11) (defining "domestic corporation" to exclude "foreign corporation"), (14) (defining "foreign corporation" as "a corporation for profit organized under laws other than the laws of this State"), (18) (defining "merger" as division of domestic corporation into two or more new domestic corporations, or into surviving corporation and at least one new domestic corporation, or combination of one or more domestic corporations with other entities) (West Supp. 2006). Article 5.06 does not apply to a merger between two foreign corporations, like Crown and Mundet, that did not incorporate in Texas. *See id.* art. 1.02(14), (18).

[14] The majority states that Crown did not dispute that it was liable for Mundet's tortious conduct under Texas law and that Crown's motion for summary judgment "conceded" its successor liability in the absence of chapter 149. However, the record reflects that Crown did dispute its successor liability under Texas law as it existed before the enactment of chapter 149. Crown opened its discussion of the successor-liability issue in its motion for summary judgment with a reference to the general rule of article 5.06. It explained the exception to that general rule in its reply, which expressly contends that article 5.06 is inapplicable to the merger of these two foreign corporations, that Satterfield's only theory of recovery from Crown is based on the doctrine of successor liability,

13

Tex. Civ. Prac. & Rem. Code Ann. § 149.006; *see also Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 443 (Tex. 2007) (stating that when deciding which jurisdiction's law applies, "[t]he first question is whether the particular substantive law is subject to a clear choice of law determination by the Legislature of the forum state"); *American Home Assurance Co. v. Safway Steel Prods. Co.*, 743 S.W.2d 693, 697 (Tex. App.—Austin 1987, writ denied) (reasoning that most-significant-relationship analysis is unnecessary if local statutory provision controls disposition of choice-of-law question).

After the enactment of chapter 149, Satterfield had no right to the continued application of New York's successor-liability law through choice-of-law rules. A "right" is a claim that one is entitled to enforce against another and a "vested right" requires more than a mere expectancy based upon an anticipated continuance of an existing law. *See Mellinger*, 3 S.W. at 253; *Trammell*, 101 S.W.2d at 1014. Satterfield may have anticipated that New York's successor-liability law would apply to her suit, but the application of New York law depended on the use of choice-of-law rules and the lack of a Texas statute governing successor liability for foreign corporations after their merger. *See Daccach*, 217 S.W.3d at 443.[15]

---

and that, until the enactment of chapter 149, successor liability involving the merger or consolidation of solely foreign corporations was not recognized by Texas law. *See id*. art. 1.02(14), (18).

[15] The majority states that Crown's summary judgment "did not raise the arguments that the Statute does not impair vested rights because it merely changes the choice of law provision or that Satterfield has no vested right in a remedy or statutory choice of law provision." However, in direct response to Satterfield's assertion of a vested right, Crown did make this argument to the trial court:

Plaintiff's cause of action accrued against Mundet Cork Corporation, the alleged tortfeasor. Liability, if any, for the torts of Mundet, a foreign corporation, could transfer to Crown, a foreign corporation, only by application of the doctrine of successor liability—a creature of individual state statute. Without the application of this

statutorily created remedy, plaintiffs would have no hope of recovery against successor corporation for the alleged torts of dissolved predecessors. Prior to the adoption of HB 4, Texas substantive law did not govern successor liability involving the merger or consolidation of solely foreign corporations. . . . In Texas courts, therefore, the successor liability of foreign corporations that merged with other foreign corporations was then determined by choice-of-law principles. . . . HB 4 changes this uncertainty. It is, first, a codified choice of law provision dictating the use of Texas substantive law in Texas courts to determine the asbestos-related successor liability of some foreign and domestic corporations. . . . Rather than deprive Plaintiff of a vested right, therefore, HB 4 created a Texas substantive remedy where no Texas substantive remedy previously existed. . . . Plaintiff could not have had a legitimate expectation that a particular foreign state's law would be applied through choice of law principles until a final judgment [was] rendered in this case. . . . HB 4 is a codified choice-of-law provision that also creates a Texas statutory remedy where none existed before. It cannot therefore be held to frustrate legitimate expectations or impair vested rights. [Citations omitted].

The majority suggests that issues raised by this argument cannot be considered because they were in Crown's reply. However, Rule 166a(c) supports a different conclusion. *See* Tex. R. Civ. P. 166a(c); *see also Alder v. Laurel*, 82 S.W.3d 372, 375-76 (Tex. App.—Austin 2002, no pet.) ("[A] trial court considering a motion for summary judgment is restricted to the issues raised in the motion, response, and subsequent replies.") (citing *Stiles v. Resolution Trust Co.*, 867 S.W.2d 24, 26 (Tex. 1993)); *Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 674-77 (Tex. 1979); *Blakey v. Texas Dep't of Health*, No. 03-02-00682-CV, 2004 Tex. App. LEXIS 1247, at * 18-19 (Tex. App.—Austin 2004, no pet.) (noting that this Court was unconvinced that summary judgment rule always prohibited movant from supplementing its grounds by way of reply if the nonmovant is not otherwise unfairly prejudiced by supplementation). Rule 166a(c) provides that

The judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion *or in an answer or any other response*. Issues not expressly presented to the trial court by *written motion, answer or other response* shall not be considered on appeal as grounds for reversal.

15

Satterfield's reliance on existing choice-of-law rules for the application of New York law resembles that of the Alabama claimants in *Owens Corning*, who relied on a Texas statute permitting them to file their asbestos-exposure claims in Texas. 997 S.W.2d at 565. Under that statute, if the claimants' suits were timely under Texas's statute of limitations, the suits could proceed in Texas, regardless of whether limitations had expired in the state where the wrongful act actually occurred. *Id.* After Texas courts became crowded with asbestos-exposure claims having little or no connection to the state, the legislature enacted a borrowing statute, providing that foreign claims could be brought in Texas only if those claims could also be brought in the state where the wrongful act occurred (thus "borrowing" the state's statute of limitations for application in Texas). *Id.* at 565-66. The statute was given immediate effect, without allowing affected parties a reasonable grace period for filing their claims after its enactment. *Id.* at 572. The Texas Supreme Court upheld the constitutionality of the borrowing statute, which it characterized as "essentially a codified choice-of-law rule." *Id.* at 573. It noted that any concerns about expectations the litigants might have had

---

Tex. R. Civ. P. 166a(c) (emphasis added). Because the issues addressing chapter 149's lack of impairment of a vested right based on a mere change to a choice of law provision and Satterfield's lack of a vested right in a remedy or statutory choice of law provision were expressly presented to the trial court by written response, the issues may be considered here.

Additionally, Satterfield was not prejudiced by the supplementation. She filed a rejoinder brief the day after Crown filed its reply, and the trial court's order specifies that it considered "the Motion, Plaintiff's Objections to Crown Cork & Seal Company, Inc.'s Summary Judgment evidence and Response to Motion for Summary Judgment, Defendant's Reply, and Plaintiff's Rejoinder."

concerning the continued application of Texas's statute of limitations played only a "minimal role" in the case. *Id.*

Like the borrowing statute in *Owens Corning*, chapter 149 contains a codified choice-of-law provision that creates a Texas-statutory remedy where none existed before—Texas had no law governing successor liability for foreign corporations after their merger. Where the common law is revised by statute, the statute controls. *Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 146 (Tex. 2003); *Pittman v. Time Sec.*, 301 S.W.2d 521, 523 (Tex. Civ. App.—San Antonio 1957, no writ). "The Texas Constitution has not undertaken to preserve inviolate the rules of the common law," and because no one has any vested or property interest in common-law rules, no one is deprived of a constitutional right when the common law is changed through legislative enactment. *Middleton*, 185 S.W. at 560-61; *Smith v. Smith*, 126 S.W.3d 660, 663 (Tex. App.—Houston [14th Dist.] 2004, no writ); *see also Columbraria Ltd. v. Pimienta*, 110 F. Supp. 2d 542, 548 (S.D. Tex. 2000) ("No person has a vested right in any general rule of law or policy of legislation entitling him to insist that it remain unchanged for his benefit."). Satterfield did not have a vested right to a successor-liability remedy that was dependent on choice-of-law rules.

### *Final judgments are legally enforceable*

The majority makes the broad assertion that "Satterfield's cause of action was accrued and pending, or vested, prior to the effective date of the Statute." But it offers no authority for the proposition that the mere filing of suit on a claimed injury constitutes a vested right to a statutory remedy provided by choice-of-law rules. Satterfield's legal argument in this summary-judgment case would be stronger if she had obtained a final judgment before the enactment of chapter 149. With

17

a final judgment, she could have claimed a legally enforceable entitlement to her successor-liability remedy. *See Mellinger*, 3 S.W. at 253 (defining "right" as claim that is "recognized or secured by law."). In that situation, the triggering event that would vest the right to impose New York's successor-liability law on Crown would be the entry of a final judgment, not the filing of a suit. *See Dickson v. Navarro County Levee Improvement Dist. No. 3*, 139 S.W.2d 257, 259 (Tex. 1940); *Durham Transp. Co. v. Beettner*, 201 S.W.3d 859, 875 (Tex. App.—Waco 2006, pet. denied); *Walls*, 900 S.W.2d at 122; *Trahan v. Trahan*, 894 S.W.2d 113, 119 (Tex. App.—Austin 1995, writ denied); *Houston Chronicle Publ'g Co.*, 798 S.W.2d at 589; *see also Pimienta*, 110 F. Supp. 2d at 548; *Thompson v. Miller*, No. 03-98-00627-CV, 1999 Tex. App. LEXIS 5538, at *4 (Tex. App.—Austin 1999, no pet.) (not designated for publication) (holding that any right claimant might have had to receive certain information prior to statute's amendment was not vested because his lawsuit had not been resolved).

Without a final judgment, Satterfield did not have a vested right, and her statutory successor-liability remedy was not beyond the reach of subsequently enacted legislation. *See Mellinger*, 3 S.W. at 253; *Trammell*, 101 S.W.2d at 1014; *Walls*, 900 S.W.2d at 121; *Houston Chronicle Publ'g Co.*, 798 S.W.2d at 589. Since 1849, the Texas Supreme Court recognized that legislative acts are not within the prohibition against retrospective laws unless they impair rights that are vested, *De Cordova*, 4 Tex. at 479, and in support of that proposition, the court considered a case that invalidated a statute "purporting to grant a new trial in a civil cause after a final judgment." *Id*. at 477. Today the majority rejects the significance of a final judgment in the vested-rights inquiry, but its significance was previously recognized by the opinion's author. *See American Honda Motor*

18

*Co. v. Miller*, 47 S.W.3d 614, 623 (Tex. App.—Austin 2001, pet. denied) (noting approval of this Court's conclusion that claimant "did not have a vested right to protest because House Bill 1595 [rescinding the right to protest] took effect prior to the time the Board rendered a final decision") (citing *Robbins Chevrolet Co. v. Motor Vehicle Bd.*, 989 S.W.3d 865, 870 (Tex. App.—Austin 2001, pet. denied). The reasoning followed by the author in *Miller* applies here—Satterfield did not have a vested right to enforce the successor-liability remedy because chapter 149 took effect before the trial court entered a final judgment.

The Texas Supreme Court's opinion in *Dickson* illustrates the concept that a final judgment is necessary to claim a vested right to a statutory remedy that subsequently collapses by legislative action. *See* 139 S.W.2d at 259. In that case, E.K. Atwood held levee bonds issued by two improvement districts. *Id*. at 258. Bondholders like Atwood had a statutory remedy allowing them to sue landowners to enforce delinquent taxes on the bonds if the districts failed to do so within sixty days after the taxes became delinquent. *Id*. Atwood, acting on behalf of the Navarro County Levee Improvement District No. 3, sued three landowners in district court to recover the taxes that they failed to pay for 1933 and 1934. *Id*. On June 25, 1937, Atwood obtained a default judgment in favor of the district for the delinquent taxes. *Id*.

While the case was on appeal, the legislature repealed the statute authorizing the bondholders' remedy. *Id*. at 259. The court of appeals subsequently affirmed the district court's default judgment. *Id*. But the supreme court set it aside, concluding that the legislature's repeal of the bondholder-enforcement statute had "wholly collapsed" the "special remedial privilege" that had been afforded to Atwood as a bond purchaser. *Id*. The court rejected the notion that Atwood had

19

been "robbed of some right" and noted although the district had obtained a judgment in its favor, the court had never entered a final judgment. *Id.* at 260.

Another case highlighting the significance of securing final adjudication when pursuing a statutory remedy is *Richardelle. See* 528 S.W.2d at 285-86. In *Richardelle*, application of a newly enacted parental-liability statute deprived an insurer of the ability to enforce a favorable jury verdict. *Id*. at 282. The verdict was against the Richardelles, parents of an eleven-year-old child who set fire to a residence. *Id*. Aetna, which insured the residence, sued the parents to recover funds paid to the homeowners on their fire-damage claim. *Id*. Although the right to attribute liability to parents for the torts of their minor children was not recognized at common law, *id*. at 285; *see also In re D.M.*, 191 S.W.3d 381, 388 (Tex. App.—Austin 2006, pet. denied), a statute in effect on the date of the fire in 1972 allowed property owners to seek compensation from parents whose children were at least ten years old when they damaged or destroyed property maliciously. 528 S.W.2d 283. That parental-liability statute was repealed on January 1, 1974, with the addition of a new title to the family code, the day before Aetna filed suit. *Id*. The new law still allowed parents to be held liable for any property damage caused by the willful and malicious conduct of their children, but it raised the minimum age of the child to twelve. *Id*. Because the Richardelles' son was eleven years old when he set fire to the house, this statute afforded the Richardelles a new statutory defense to Aetna's suit.

Aetna argued that the suit should be governed by the law in effect when the Richardelles' son set the fire and that the new law destroyed its vested right to proceed against the parents of ten-and eleven-year-old children who committed willful and malicious torts. *Id*.

20

Rejecting Aetna's assertion of a vested right, the court stated that no person has a vested right to a particular remedy accorded by law, either at common law or by statute. *Id*. at 284 (citing *Middleton*, 185 S.W. 556). It noted that the statute giving Aetna the right to sue the Richardelles was repealed before proceedings commenced to enforce such right, and before the repeal Aetna had not been granted final relief on the enforcement of its demand. *Id*. at 285-86; *see Walls*, 900 S.W.2d at 122.

The concept that rights vest upon final adjudication is also illustrated in a recent decision from a Florida court that considered a retroactivity challenge to the state's Asbestos and Silica Compensation Fairness Act. *See DaimlerChrysler Corp. v. Hurst*, 949 So. 2d 279, 281 (Fla. Dist. Ct. App. 2007, pet. denied). Due to a flood of asbestos litigation, the Florida legislature passed a law barring smokers from filing or maintaining civil suits that attributed their lung cancer to asbestos exposure unless they provided a diagnosis from a qualified physician concluding that exposure to asbestos was a substantial contributing factor to their cancer. *Id*. at 283-84. The legislature specified that the Act was to be applied to all pending asbestos-related cases in which trial had not commenced as of the effective date. *Id*. at 284-85. The claimant in *Hurst* was the wife of the decedent, who had quit smoking about thirteen years before his lung cancer diagnosis. *Id*. at 282. She argued that the addition of the "substantial contributing factor" requirement to her pending suit against DaimlerChrysler was unconstitutional because it deprived her of a vested right. *Id*. at 285. The trial court agreed and denied DaimlerChrysler's motion to dismiss Hurst's claim. *Id*. at 282.

Reversing that ruling, the appellate court stated that when Hurst filed suit she was pursuing a common law tort theory and had, at most, a mere expectation that the common law would not be altered by legislation. *Id*. at 286-87. The court held that Hurst did not have a vested right,

21

and it distinguished her expectancy from cases in which claimants had obtained a judgment before the effective date of a statute or had a right to recover a definite sum of money that was due when the new legislation passed. *Id*. at 287; *see Flowserve Corp. v. Bonilla*, 952 So. 2d 1239 (Fla. Ct. App. 2007) (relying on *Hurst* to quash trial court's order that held Asbestos and Silica Compensation Fairness Act unconstitutional).

Here, it is undisputed that final judgment had not been entered before the enactment of chapter 149. Similar to the claimants in *Dickson* and *Hurst*, Satterfield had only an expectation that her statutory remedy would remain unchanged. Like the insurer in *Richardelle*, Satterfield sought recovery from a non-tortfeasor, relying on a vicarious-liability theory that was unavailable at common law and to which she had no vested right.

Furthermore, the partial summary judgment entered by the district court did not transform Satterfield's expectation of a successor-liability remedy under New York law into a vested right. That judgment was not final when chapter 149 became effective four days later. The district court would have been able to reconsider its ruling on the partial summary judgment and reverse it. *See Elder Const., Inc. v. City of Colleyville*, 839 S.W.2d 91, 92 (Tex. 1992). Satterfield cannot maintain her vested-right argument based on a trial-court ruling that was interlocutory. *See Middleton*, 185 S.W. at 561 (concluding that law may be changed by legislature so long as it does not destroy or prevent adequate enforcement of vested rights); *Dickson*, 139 S.W.2d at 259-60 (setting aside default judgment that was not final and was not immune to subsequent legislative action).

Satterfield has not demonstrated that chapter 149 violates the constitutional prohibition against retroactive laws because she has not shown that she had a vested right to a successor-liability remedy through choice-of-law rules. *See De Cordova*, 4 Tex. at 479-80 (recognizing that constitutional prohibition against retroactive laws is not violated without destruction or impairment of vested right); *see also Corpus Christi People's Baptist Church*, 904 S.W.2d at 626 (same); *Project Principle, Inc.*, 724 S.W.2d at 390 (same).

### *Abrogation of remedy*

The majority opinion further misdirects the constitutional inquiry by relying on a case interpreting the Pennsylvania Constitution, which has no prohibition against retroactive laws. In that case, a closely split court invalidated a successor-liability statute under the open courts provision of the Pennsylvania Constitution because the statute eliminated the claimants' remedy. *See Ieropoli v. AC&S Corp.*, 842 A.2d 919, 932 (Penn. 2004). At least three significant problems arise with the majority's reliance on that case: (1) Satterfield never raised an open-courts challenge to chapter 149 in response to Crown's summary-judgment motion; (2) the invalidated Pennsylvania statute was broader (affording an affirmative defense to a larger, less-innocent set of corporate successors) than the one at issue here; and (3) over four pages are devoted to discussion of nonbinding Pennsylvania authority but the Fifth Circuit's application of Texas law to a statute challenged on open courts grounds as barring the claimant's remedy is reduced to a footnote.[16] *See Jones v. Pullman Kellogg*

---

[16] The sole Texas decision concerning the constitutionality of chapter 149, on facts remarkably similar to this case, is not considered by the majority opinion. *See Robinson v. Crown Cork & Seal Co.*, 251 S.W.3d 520, 523 (Tex. App.—Houston [14th Dist.] 2006, pet. granted).

*Corp.*, 785 F.2d 1270 (5th Cir. 1986). If the majority is inclined to consider an open courts provision, it should be the provision in the Texas Constitution. Additionally, it is my opinion that the Fifth Circuit's interpretation of the law has greater persuasive value in this Texas case than that of a court in Pennsylvania, construing a broader statute and a different constitution in the context of an open courts challenge that is not before this Court.

The Texas Supreme Court has long held that laws affecting a claimant's remedy in pending cases—providing a new statutory defense for instance—are constitutional if the claimant's remedy is not taken away entirely. *See City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex. 1997) (citing *De Cordova*, 4 Tex. at 480); *see also Burlington N. & Santa Fe R.R. Co. v. Skinner Tank Co.*, 419 F.3d 355, 359-60 (5th Cir. 2005). Quoting the supreme court in *Likes*, Satterfield acknowledges that a statute does not violate the constitutional prohibition against retroactivity if it affords a reasonable time or fair opportunity to preserve a claimant's rights under the former law, or if the amendment does not bar all remedy. 962 S.W.2d at 502. Additionally, the supreme court has concluded that a grace period is unnecessary when, as here, its inclusion would defeat the very purpose of the statute. *Owens Corning*, 997 S.W.2d at 573. Thus, even if Satterfield somehow had a vested right to impose successor liability against Crown, chapter 149 will pass constitutional muster, even without a grace period, if it does not completely deprive her of remedies for the tort claims in her suit.

Arguing that her claims were "completely extinguished," Satterfield compares chapter 149's effect on her suit to that of the legislation challenged by the claimants in *Likes*. 962 S.W.2d at 489. However, the legislation at issue in *Likes* reclassified the city's storm sewer operation as a

24

governmental function for which the city could not be sued—even though operation and maintenance of the sewers had been classified as proprietary functions for which a city could have been sued at common law. *Id*. at 502. As a result of the statutory reclassification, cities were immune from every suit alleging negligent maintenance of its storm sewers, and a claimant's recovery of any amount from a municipal defendant for such claims was forever barred. *See id*. By contrast, chapter 149 does not grant immunity from suit to every asbestos-manufacturer's successor, and it does not bar Satterfield's cause of action. *Compare id*., *with* Tex. Civ. Prac. & Rem. Code Ann. § 149.003.[17]

In contrast to the challenged statute in *Likes*, chapter 149 does not cause complete deprivation of a legal remedy. Applying Texas law, the Fifth Circuit has recognized that a statute does not leave a claimant "without any 'viable' defendants or 'effectively den[y] a cause of action'" when she has claims remaining against other defendants. *Jones*, 785 F.2d at 1273 (citing *Nelson v. Metallic-Braden Bldg. Co*., 695 S.W.2d 213, 215 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); *see also Gomez v. Pasadena Health Care Mgmt.*, 246 S.W.3d 306, 314 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (concluding that three-year survival statute for minor's health-care liability claim did not effectively abrogate claimant's right to redress against medical center and its general partner because claimant had alternative remedy of suit against physicians); *Wilson v. AC&S, Inc*., 864 N.E.2d 682, 695 (Ohio Ct. App. 2006) (holding that new statute, which required proof that asbestos exposure was substantial contributing factor to claimant's medical condition, could be

---

[17] In *Likes*, "entirely taken away" equated not to a cap on the amount of a defendant's statutory liability or the pursuit of money in addition to any other defendant's paid settlement, but an absolute abrogation of remedy for the injuries alleged, yielding the claimant a total recovery of zero dollars. That was not the case here.

applied to pending cases and did not abrogate claimant's vested right because she was still able to pursue her cause of action and recover for injury caused by her husband's exposure to asbestos; statute merely affected methods and procedure by which that action was recognized, protected and enforced, not the cause of action itself), *appeal dism'd*, 864 N.E.2d 645 (Ohio 2007).

In *Jones*, the widow of a Gulf Oil refinery worker brought a wrongful death and survivorship suit against Pullman Kellogg and appealed the trial court's dismissal of her case on summary judgment. *Id*. at 1271. She alleged that from the mid-1960s until 1975 her husband worked around a fluid catalytic cracking unit that was designed by Pullman Kellogg, and that he was continually exposed to polynuclear aromatic hydrocarbons which ultimately caused his lung disease. *Id*. Pullman Kellogg responded that the ten-year statute of repose for suits against architects and engineers barred Jones's suit. *Id*. Jones asserted that the statute violated the open courts clause of the Texas Constitution because her suit was barred before her husband's injury manifested itself. *Id*. at 1272.

Affirming the constitutionality of the statute, the Fifth Circuit concluded that Jones still had a legal remedy because she was able to pursue her claims against other defendants. *See id.*; *see also Gomez*, 246 S.W.3d at 314; *Wilson*, 864 N.E.2d at 695. The court noted that Jones had sued her husband's employer as well as thirteen manufacturers and suppliers of asbestos-containing products and that she had entered into settlement agreements with several of them.[18] *Id*.

---

[18] *Jones* illustrates the factual basis for a Texas court's rejection of the argument that a claimant was left without any viable defendants or effectively denied a cause of action. For over a century, the Texas Supreme Court has recognized that laws affecting a remedy are not unconstitutionally retroactive unless the remedy is entirely taken away. *See De Cordova*, 4 Tex. at 480; *see also Burlington N. & Santa Fe R.R. Co. v. Skinner Tank Co.*, 419 F.3d 355, 359-60 (5th Cir.

26

Satterfield's legal position is similar to Jones's because chapter 149 does not prevent Satterfield from pursuing her remedies or recovering all of her damages, jointly and severally, from numerous other defendants (nor does it affect any settlement that she has already received in this case). Accordingly, chapter 149 does not violate the constitutional prohibition against retroactive laws in article I, section 16.

Furthermore, there is no violation of article I, section 16 because chapter 149 is a remedial statute that could be applied to pending cases. *See Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 525 (Tex. 1975) (holding that statute which became effective after claimant's death but prior to the trial of wrongful death case was remedial, constitutional; and governed pending litigation proceedings that were pending when statute was enacted); *De Cordova*, 4 Tex. at 477 (recognizing that laws merely regulate the remedy are not within constitutional prohibition against retrospective laws); *Villers v. Republic Fin. Servs., Inc.*, 602 S.W.2d 566, 572 (Tex. App.—Texarkana 1980, writ ref'd n.r.e.) (noting that generally, statutes concerning remedies are to be applied to actions tried after their passage even though action arose beforehand); *Sergeant Enters., Inc. v. Strayhorn*, 112 S.W.3d 241, 250 (Tex. App.—Austin 2003, no pet.) (recognizing that remedial statutes may be applied to pending cases because they usually do not affect vested right); *see* 16A C.J.S. *Constitutional Law* § 267 (1986) ("A statute which relates merely to matters of remedy may be made applicable

2005); *City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex. 1997). The majority states that *Jones* "did not consider whether such a law would violate the Texas Constitution's express prohibition against retroactive laws in article I, section 16." However, that is not a relevant concern. Retroactivity is a non-issue if the claimant is not completely deprived of a remedy. *Jones* offers assistance in understanding what facts do not constitute complete abrogation of a claimant's remedy and for that reason, it is entirely instructive here.

to pending proceedings at any time before the final judgment of the court becomes effective."). A remedial statute is one that introduces a new regulation for the advancement of the public welfare or conducive to the public good, affords a remedy, improves and facilitates existing remedies, or corrects defects, mistakes, and omissions in the laws of the State. *Lukes v. Employees Ret. Sys. of Tex.*, 59 S.W.3d 838, 842 (Tex. App.—Austin 2001, no pet.) (citing *Sims v. Adoption Alliance*, 922 S.W.2d 213, 217 (Tex. App.—San Antonio 1996, writ denied)).

Chapter 149 is a remedial statute because it corrected an omission in Texas law concerning the post-merger successor liability of foreign corporations. Chapter 149 also addressed the long-tailed, unpredictable asbestos-related liabilities that may bankrupt successor corporations:

> A corporation is currently liable up to its total value for all injuries it causes. If that corporation merges with a much larger corporation, however, the successor corporation is liable for the injuries caused by its predecessor (even though not caused in any way by the successor) up to the successor's much higher value. In the case of long-tailed and unknown asbestos-related liabilities, a much larger successor can easily be bankrupted by the asbestos-related liabilities it innocently received from a much smaller predecessor with which it merged many decades ago. To eliminate that unfairness—and even to save successor corporations from bankruptcy—some have proposed a new rule limiting liability especially for asbestos-related successor liabilities acquired solely through a merger. . . . [Under this rule], any asbestos-related liabilities acquired solely through a merger would be traced back through one or more mergers to the original transferor who did something related to asbestos that actually resulted in harm. The total of transferred liabilities that the successor corporation had to pay would be limited to the value (adjusted upward for time and inflation) of the total gross assets of the original transferor that caused those same liabilities.

H.J. of Tex., 78th Leg., R.S. 6042-43.

Because chapter 149 is a remedial statute that could be applied to pending cases and because the statute did not bar Satterfield from pursuing her claims against multiple other defendants, it is constitutional under article I section 16.

### *Police power*

The next fundamental flaw in the majority opinion is that it does not recognize the legislature's right to reasonably exercise its police power after balancing the competing considerations on its own. Dismissing chapter 149 as being enacted under the mere "guise" of police power, the majority posits that the needs of the public are distinct from the financial protection of a particular private-business segment. But the connection between the solvency of a particular business segment and potential public harm is evident to Satterfield, who does not dispute the significance of the asbestos-litigation crisis to non-tortfeasor successor corporations or the potential effects of their bankruptcies on Texas jobs and state revenue. The Supreme Court has also made the connection between support of a business sector and prevention of public harm, holding that protection of the people's vital interests is not limited to health, morals and safety, but extends to economic needs as well. *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38-39 (1940) (upholding state statutes designed to protect solvency of building and loan associations as constitutional exercise of state's police power); *see also Brand v. Korth*, 99 S.W. 2d 285, 287 (Tex. 1936) (recognizing that exercise of legislative police power extends to safeguarding solvency of banks). Contrary to the majority's declaration that the legislature's enactment of chapter 149 is outside the scope of the police power, the Supreme Court has determined that legislation aiming to benefit state residents and their economic interests—by increasing state industries, developing

its resources, and adding to its wealth and prosperity—is embraced by the police power. *Barbier v. Connolly*, 113 U.S. 27, 31 (1885); *see also Jefco, Inc. v. Lewis*, 520 S.W.2d 915, 922 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e) (citing *City of Coleman v. Rhone*, 222 S.W.2d 646, 648 (Tex. Civ. App.—Eastland 1949, writ ref'd)). Chapter 149 serves the public goals recognized by the Supreme Court. It seeks to minimize financial peril to non-tortfeasor successor corporations and reduce risks to jobs and pensions, which promotes the state's prosperity and addresses proper subject matter for the exercise of legislative police power.

"A large discretion is necessarily vested in the Legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests." *State v. Richards*, 301 S.W.2d 597, 602 (Tex. 1957); *Grothues v. City of Helotes*, 928 S.W.2d 725, 729 (Tex. App.—San Antonio 1996, no writ) ("As the affairs of the people and government change and progress, so the police power changes and progresses to meet the needs.") (quoting *City of Breckenridge v. Cozart*, 478 S.W.2d 162, 165 (Tex. Civ. App.—Eastland 1972, writ ref'd n.r.e.)). Accordingly, whether a legislative act will serve a public use or purpose is, in the first instance, a question for the determination of the legislature, and that determination or decision cannot be reviewed and the contrary determined by the judiciary except in instances where the legislative determination of the question is palpably and manifestly arbitrary and incorrect. *Rhone*, 222 S.W.2d at 649 (quoting *Neal v. Boog-Scott*, 247 S.W. 689, 691 (Tex. Civ. App.—Beaumont 1923, no writ)); *see also Jefco*, 520 S.W.2d at 922 (citing *Rhone*, this Court stated that wisdom of exercise of police power is largely for legislative rather than judicial determination, courts will not

30

disturb exercise of police power unless it was unnecessary and unreasonable, and if difference of opinion exists as to its necessity and reasonableness, courts will not invalidate it).

Because operation of the police power often results in the abridgment of private rights, *Spann v. Dallas*, 235 S.W. 513, 515 (Tex. 1921), individual hardship is balanced against the statute's public advantages in determining whether a statute is a valid exercise of police power, *State v. City of Austin*, 331 S.W.2d 737, 743 (Tex. 1960); *Texas State Teachers Ass'n v. State*, 711 S.W.2d 421, 424 (Tex. App.—Austin 1986, writ ref'd n.r.e.).

Here, the legislature enacted a limitation on the asbestos-related liability of non-tortfeasor successor corporations to contain the financial peril threatening non-tortfeasor successor corporations and to reduce the resulting risks to Texans' jobs and pensions[19] when the financial stability of those corporations is jeopardized by successor-liability litigation. The statement of legislative intent expresses the policy behind the law and the harm that it was intended to address:

> Corporations actually in the asbestos business and their successors through merger have been financially drained by decades of litigation. As a result, nearly 70 such corporations have sought protection through bankruptcy. The cost in jobs and pension benefits, to cite just two examples, has been substantial. This legislation seeks to help keep remaining hard-pressed successors out of bankruptcy.

H.J. of Tex., 78th Leg., R.S. 6044.

---

[19] The expansion of successor-liability asbestos litigation affects Texas residents. Crown's former secretary and general counsel, Richard Krzyzanowski, testified that Crown's subsidiaries or affiliates produce beverage cans at facilities in Conroe, Sugarland, and Abilene. Those three facilities employ almost 1,000 Texans and contribute $5 million in property and franchise taxes to the state. Krzyzanowski further noted that Crown's corporate family includes approximately as many Texas retirees as employees.

To attain these objectives and after balancing the competing interests, the legislature expressly decided to apply chapter 149 to pending cases. *See* Tex. Civ. Prac. & Rem. Code Ann. § 149.001 (mandating application of chapter 149 to all cases "in which the trial, or any new trial or retrial following motion, appeal, or otherwise, begins on or after that effective date."); *Lebohm v. City of Galveston*, 275 S.W.2d 951, 955 (Tex. 1955) (op. on reh'g) (stating that police power includes legislative authority to withdraw remedies for causes of action when that withdrawl "is a reasonable exercise of the police power in the interest of the general welfare."); *see also Quick v. City of Austin*, 7 S.W.3d 109, 136 (Tex. 1999) (Hankinson, J., dissenting) (noting that "[w]hether to apply a statute retroactively is, for very good reasons, a legislative policy choice"). Through May 2003, Crown had already paid successor asbestos-related claims totaling more than $413 million. If it had been required to continue paying such claims, Crown would have been threatened with bankruptcy—the precise consequence that the legislature sought to prevent for all similarly situated corporations.

Satterfield concedes that the legislature may enact laws that affect pending matters—if the legislation addresses water conservation, protection of the environment or children, or the regulation of professions, zoning, or handguns—because valid exercise of police power in the public interest is a recognized exception to the unconstitutionality of laws with potential retroactive effect. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (citing *Barshop v. Medina County Underground Water Dist.*, 925 S.W.2d 618, 633-34 (Tex. 1996)); *see also Kilpatrick v. State Bd. of Registration for Prof'l Eng'rs*, 610 S.W.2d 867, 871 (Tex. Civ. App.—Fort Worth 1980, writ ref'd

32

n.r.e) ("The constitutional rules against impairing contracts and retroactive laws are not absolute and must yield to a state's right to safeguard the public safety and welfare.").[20]

However, she also argues that the prohibition against retroactive laws in article I, section 16 of the Texas Constitution's Bill of Rights is strengthened by article I, section 29 of the constitution, which states that everything in the Bill of Rights "is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto . . . shall be void." *See* Tex. Const. art. I, § 29.

Satterfield fails to explain the evident inconsistency between (1) her recognition of the constitutionality of applying certain police-power-enacted laws (involving water conservation; protection of the environment and children; and regulation of professions, zoning, and handguns) to pending claims, and (2) her assertion that article I, section 29 prohibits all retroactive laws. *See*

---

[20] The question of "whether the legislature reasonably exercised its police power to enact a retroactive law" has been answered at least twice by the author of the majority opinion, who stated that, "[w]hile article 1, section 16 of the Texas Constitution expressly forbids retroactive legislation, it has been consistently construed not to invalidate all retroactive legislation." *Institute of Cognitive Dev., Inc. v. Texas Dep't of Mental Health & Mental Retardation*, No. 03-98-00376-CV, 1999 Tex. App. LEXIS 4780, at *13 (Tex. App.—Austin 1999, no pet.). The author further noted that "valid exercise of the police power by the legislature to safeguard the public safety and welfare can prevail over a finding that a law is unconstitutionally retroactive." *Id.* at *22 (citing *Barshop v. Medina County Underground Water Dist.*, 925 S.W.2d 618, 637-38 (Tex. 1996); *Texas State Teachers Ass'n v. State*, 711 S.W.2d 421, 424 (Tex. App.—Austin 1986, writ ref'd n.r.e.)).

The majority's discussion of legislative police power contains conflicting assertions. On the one hand, it states that "the Texas Legislature has no power, police or otherwise" to enact a retroactive law. On the other hand, just four pages later, it recognizes that in *Barshop* and other cases, the legislature's enactment of laws that applied to pending causes of action "may have involved a valid exercise of police power."

33

*id*. art. I, §§ 16, 29.[21]  Because Satterfield concedes that, at least in some instances, the legislature may enact laws under its police power that apply to pending claims without running afoul of the Texas Constitution, there is no need to attempt to reconcile the inconsistency in her argument.[22]

Courts are reluctant to disturb legislative action on subject matter that lies within the police power and will not do so unless it clearly appears that the regulation is unnecessary, unreasonable,[23] and unjustified by the facts.  *Bellaire v. Lamkin*, 317 S.W.2d 43, 45-46 (Tex. 1958)

---

[21]  The utility of article I, section 29 of the Texas Constitution has been questioned:

> Presumably section 29 was designed as a closing flourish to emphasize the importance of the Bill of Rights.  Unfortunately, it is not clear just what it means and one is left with the suspicion that despite the apparently strong language it means nothing at all.  Section 29 has been cited in relatively few cases and in them the decision typically turned on another section of the Bill of Rights cited with section 29. . . .  Section 29 seems to be a meaningless provision of the Bill of Rights.  It is not even the aid to rigid construction which it might appear to be. . . .  Article I today is redundant, confusing, partially obsolete and in places highly technical.  In its present form its justification is history not logic.

1 George D. Braden, et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 85-86 (1977).

[22]  The Texas Supreme Court has observed that meaning of the Texas Constitution must be sought with the understanding that it "was ratified to function as an organic document to govern society and institutions as they evolve through time."  *Davenport v. Garcia*, 834 S.W.2d 4, 19 (Tex. 1992).  If the majority's interpretation of article I, section 29 is legally sound, then all contemporary Texas statutes that place any limit whatsoever on the freedoms of speech, press, or religion; the right of due process; or any other provision in the bill of rights, are unconstitutional.

[23]  The majority asserts that legislative intent and an assessment of a statute's reasonableness are impossible without something akin to Congressional findings.  But as the Texas Supreme Court has stated, the "surest guide to legislative intent" is in the words that the legislature chooses to use in a statute.  *Leland v. Brandal*, 2008 Tex. LEXIS 574, at *5 (Tex. June 13, 2008) (quoting *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999)).  Interestingly, in the paragraph immediately following this assertion, the majority concludes that chapter 149 is not a reasonable exercise of legislative police power.

(citing *Rhone*, 222 S.W.2d at 649); *Jefco, Inc.*, 520 S.W.2d at 922; *Martin v. Wholesome Dairy Inc.*, 437 S.W.2d 586, 591-92 (Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.). As the Texas Supreme Court has stated, "*If there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment on a subject which lies within the police power, the courts will not hold it void.*" *Bellaire*, 317 S.W.2d at 45-46 (emphasis in original); *Jefco*, 520 S.W.2d at 922; *Martin*, 437 S.W.2d at 592.

Satterfield has not made it clearly apparent that chapter 149 is unnecessary, unreasonable, and unjustified by the facts. *See Bellaire*, 317 S.W.2d at 45-46. To invalidate chapter 149, Satterfield would have this Court reject the statement of legislative intent accompanying the statute's enactment. However, because there is room for a fair difference of opinion as to the necessity and reasonableness of chapter 149 on subjects that lie within the police power (i.e., promotion of the public interest in jobs and pensions, increasing state industries, developing its resources, and adding to its wealth and prosperity), this Court will not hold it void. *See id.*; *see also Barshop*, 925 S.W.2d at 634 (holding that Edwards Aquifer Act's cap on landowners' water withdrawl was necessary to safeguard public welfare and that consideration of preexisting users' water consumption before effective date of Act did not render Act unconstitutional).

Chapter 149 handles competing economic interests: having a remedy available for claimants by shifting tort liability to successor corporations versus minimizing financial risk to successor corporations and the jobs and pensions provided by those corporations. Balancing these competing interests is a quintessential function of the legislature, not the judiciary. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 n.38 (Tex. 2008) (Willett, J., dissenting).

35

Having concluded that Satterfield failed to demonstrate the unconstitutionality of applying chapter 149 to this case, consideration is given to her next constitutional challenge: whether chapter 149 constitutes a special law.

**Constitutional challenge under article III, section 56**

In her second issue, Satterfield argues that chapter 149 "singles out Crown and Crown alone" for special treatment in violation of the Texas Constitution's prohibition against special laws. *See* Tex. Const. art. III, § 56. This argument presents a facial challenge to the statute, requiring Satterfield to demonstrate that there is "no possible state of facts" under which the statute would be constitutional. *See Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 520 (Tex. 1995). Crown responds that chapter 149 is not a special law because it is applicable to a substantial class and its classifications are reasonable.

A special law is limited to a particular class of persons distinguished by some characteristic other than geography. *Ford Motor Co. v. Sheldon*, 22 S.W.3d 444, 450 (Tex. 2000); *Maple Run at Austin Mun. Util. Dist. v. Monaghan*, 931 S.W.2d 941, 945 (Tex. 1996). Article III, section 56 of the Texas Constitution enumerates thirty contexts in which "the Legislature shall not, except as otherwise provided in this Constitution, pass any local or specialized law." Additionally, "in all other cases where a general law can be made applicable, no local or special law shall be enacted." Tex. Const. art. III, § 56.[24]

---

[24] This general prohibition does not preclude the legislature from passing special laws for preservation of Texas fish and game and fence laws "as may be needed to meet the wants of the people." Tex. Const. art. III, § 56(b)(1), (2).

Broad authority rests with the legislature to make classifications for legislative purposes. *Sheldon*, 22 S.W.3d at 450; *Juliff Gardens, LLC v. Texas Comm'n on Envtl. Quality*, 131 S.W.3d 271, 281 (Tex. App.—Austin 2004, no pet.). Legislative classifications "must be broad enough to include a substantial class and must be based on characteristics legitimately distinguishing such class from others with respect to the public purpose sought to be accomplished by the proposed legislation." *Sheldon*, 22 S.W.3d at 451 (upholding reasonableness of statutory classification of class actions involving motor vehicle licensees because automobile is one of consumers' largest and most important purchases and class actions involving automobiles affect many individuals); *Juliff Gardens*, 131 S.W.3d at 281 (upholding reasonableness of statutory classification of proposed landfills because those landfills were less regulated than others and their resulting pollution had potential to affect population centers, aquatic habitat, and recreational fishing).

In determining whether a statute is a special law, it is appropriate to examine the statute's legislative history. *Juliff Gardens*, 131 S.W.3d at 282 n.7. "The primary and ultimate test of whether the law is general or special is (1) whether there is a reasonable basis for the classification made by the law, and (2) whether the law operates equally on all within the class." *Sheldon*, 22 S.W.3d at 451 (quoting *Rodriguez v. Gonzales*, 227 S.W.2d 791, 793 (Tex. 1950)). Before a statute will be nullified by the constitutional proscription of article III, section 56, it must clearly appear that there is no reasonable basis for the classification adopted by the legislature to support the statute. *County of Cameron v. Wilson*, 326 S.W.2d 162, 167 (Tex. 1959). As this Court observed, "If there could exist a state of facts justifying the classification or restriction complained of, courts will assume that it existed." *Inman v. Railroad Comm'n*, 478 S.W.2d 124, 127 (Tex. Civ.

37

App.—Austin 1972, writ ref'd n.r.e.) (quoting *Reed v. City of Waco*, 223 S.W.2d 247, 252 (Tex. Civ. App.—Waco 1949, writ ref'd)).

Because Satterfield does not allege that chapter 149 applies unequally to those within the defined class, her special-law challenge can succeed only if she demonstrates the first prong of the special-law test: that the legislative classifications in chapter 149 are unreasonable and bear no substantial relation to objectives sought to be accomplished by the act. *See Sheldon*, 22 S.W.3d at 451; *Monaghan*, 931 S.W.2d at 946.

### *Reasonableness of classifications*

Satterfield argues that chapter 149 "creates an unconstitutional special class of one" and that its narrowly defined class is not reasonably related to the statute's "purported goals." She specifically asserts that: (1) details defining the class fit Crown and it is the only corporation known to have raised the statutory defense; (2) a class that includes only Crown is not reasonably related to the objective of saving corporate successors on the verge of bankruptcy; and (3) a senator's remark about the "Crown Cork and Seal asbestos issue" reveals that chapter 149 created only a "pretend" class.

### 1. Classification details

First, Satterfield states that the details defining the class in chapter 149 were tailored to fit Crown's corporate history and that Crown has been unable to identify another corporation encompassed by the statute's classifications. But she concedes that Crown had no legal burden to make that identification. As the party that initiated the challenge to the constitutionality of

38

chapter 149, Satterfield had the burden of demonstrating its unconstitutionality. *See Walker v. Gutierrez*, 111 S.W.3d 56, 66 (Tex. 2003). She cannot prevail by attempting to shift her burden of proof to Crown. Satterfield has not referenced any case striking a statute as a special law solely because the potential class size was small. Rather, the test of a special law is whether there is a reasonable basis for the classification and whether the law operates equally on all within the class. *Sheldon*, 22 S.W.3d at 451. Merely because Crown is the only entity to assert the applicability of chapter 149 thus far does not mean that any other corporate successor that may have failed to do so is statutorily ineligible. As the supreme court has recognized, the fact that a statute that may have applied to only one entity when it was enacted does not compel the conclusion that it is a special or local law if it is "not so inflexibly fixed" as to prevent it from ever being applicable to others. *Bexar County v. Tynan*, 97 S.W.2d 467, 469-70 (Tex. 1936) (considering legislation applicable to only one county).

Second, Satterfield criticizes chapter 149's use of May 13, 1968, as the merger deadline for a successor corporation to become eligible for the asbestos-liability limitation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 149.002(a). She claims the classification is unreasonable because the Texas Department of Health suspected the hazards of asbestos since 1958 and had adopted a workplace regulation capping the concentration of asbestos dust at 5 million particles per cubic feet of air ("mppcf"). That regulation approved of the listed concentrations as "generally safe" and noted that the concentrations "were not maximum values" but could be momentarily exceeded.

However, Satterfield has not clearly demonstrated that there is no reasonable basis for the legislative classification concerning the May 13, 1968 merger deadline. *See Wilson*,

326 S.W.2d at 167; *see also Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968) (stating that mere difference of opinion, where reasonable minds could differ, is insufficient basis for striking legislation as arbitrary or unreasonable). In 1968, the American Conference of Governmental Industrial Hygienists (ACGIH) tightened the asbestos concentration standard significantly, cutting the limit by more than half to 2 mppcf. H.J. of Tex., 78th Leg., R.S. 6044. The ACGIH first adopted that change on May 13, 1968, following Dr. Irving Selikoff's issuance of his "famous warnings in the mid-1960s about the dangers of asbestos in the workplace." *Id*.

According to the statement of legislative intent, the classification that required the original transfer of successor asbestos liabilities to have occurred before May 13, 1968, was included to concentrate the liability limitation on innocent successor corporations. *Id*. at 6043-44. Logically, successors that had not engaged in the asbestos business, did not intend to take over their predecessors' asbestos business, and merged before 1968 were unlikely to have known about any workplace asbestos regulation—much less that Texas's standard 5 mppcf limit was unsafe. *See id*. I am unpersuaded that the merger deadline in chapter 149 is unreasonable.

Third, Satterfield asserts that the successor-to-successor provision in chapter 149 was designed specifically for Crown, which changed its state of incorporation from New York to Pennsylvania by merger and consolidation in 1989. I disagree. Chapter 149 was intended to allow successors who receive only the same bundle of original asbestos liabilities through successive mergers to plead the liability limits applicable to the first pre-1968 successor. *Id*. at 6043; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 149.002(a). Without this provision, chapter 149 would be ineffective to accomplish its legislative intent: corporations that currently satisfy chapter 149 but

40

subsequently merge with another corporation would relinquish their eligibility for the liability limitation, even though their culpability for asbestos-related claims would still be nonexistent. And without this provision, as Crown notes, claimants who could not sue the intermediate successor would have a revived cause of action against an equally innocent corporation that is even further removed from the corporation from which the liability derived.

Courts must reject interpretations of a statute that defeat the purpose of the legislation, so long as another reasonable interpretation exists. *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996); *see Webb County Appraisal Dist. v. New Laredo Hotel, Inc.*, 792 S.W.2d 952, 954 (Tex. 1990) (cautioning that the legislature is not presumed to have done "a useless act"). Inclusion of the successor-to-successor provision in a statute designed to address the long-tailed, unpredictable asbestos-related liabilities that may bankrupt successor corporations, *see* H.J. of Tex., 78th Leg., R.S. 6043, bears a substantial relation to the legislative objectives sought. *See Sheldon*, 22 S.W.3d at 451; *Monaghan*, 931 S.W.2d at 946.

### 2. Bankruptcy risk

Satterfield next contends that chapter 149 is not rationally related to the objective of averting bankruptcy for corporate successors because Crown is not at risk of bankruptcy. For the reasons that follow, I conclude that Crown's inclusion in the class of successor corporations attempting to avert bankruptcy is reasonable.

Through May 2003, Crown compensated claimants in an amount that exceeded Mundet's adjusted fair market value almost six times—paying over $413 million. Crown states that its continued responsibility to pay such claims would have posed a bankruptcy threat. It has already

refinanced $1 billion of debt in 2003 to continue its operations, and it will have to pay $1 billion of that refinanced debt in 2008. As Crown noted in its annual report filed with the United States Securities and Exchange Commission, the fate of recent legislation limiting successor liability could materially affect Crown's operations, financial position, and cash flow.

However, chapter 149 does not require deviation from some threshold of solvency before the statute will apply to a corporate successor. Rather, chapter 149 sought to address unfairness to innocent successor corporations and stem negative economic effects on employees and pensioners. The scope of Crown's successor liability is not premised on any sale, manufacture, or distribution of asbestos-containing products, and the duration of its liability before chapter 149 was almost infinite. Unlike an actual tortfeasor, Crown was unable to take any corrective action to minimize its potential successor-related asbestos liability. Judgments against Crown cannot function as legitimate deterrents to the alleged tortious acts or omissions of Mundet. It would not have been unreasonable for the legislature to include innocent corporate successors that have paid more than six times their predecessors' adjusted fair market value in asbestos-related claims within theclassification of those eligible for the liability limit. There is a strong presumption that the legislature understands and appreciates the needs of the people and that its discriminations are based on adequate grounds. *Enron Corp. v. Spring Indep. Sch. Dist*., 922 S.W.2d 931, 934 (Tex. 1996); *Williams v. Razor Enters., Inc*., 70 S.W.3d 274, 275-76 (Tex. App.—San Antonio 2002, no pet.).

### 3. Pretend class

Satterfield further contends that a senator's remark about the "Crown Cork and Seal asbestos issue" reveals that chapter 149 created only a pretend class. A "pretended" class, as

defined by this Court, is one that "manifest(s) a purpose to evade the constitution." *Public Util. Comm'n v. Southwest Water Serv., Inc.*, 636 S.W.2d 262, 265 (Tex. App.—Austin 1982, writ ref'd n.r.e.) (quoting *Clark v. Finley*, 54 S.W. 343, 346 (Tex. 1899)).

Crown's involvement in asbestos litigation did precede the legislature's action with regard to chapter 149. During a meeting of the Texas Senate State Affairs Committee, its chair described article 17 of House Bill 4:

> Article 17, limitations in civil actions of liabilities relating to certain mergers or consolidations. This, members, is the Crown Cork and Seal asbestos issue. What we have put in this bill is what I understand to be an agreed arrangement between all of the parties in this—in this matter.

Meeting on Proposed Senate Substitute for Tex. H.B. 4, State Senate Affairs Committee, 79th Leg., R.S., 13 (Apr. 30, 2003). I disagree with Satterfield's suggestion that this shorthand reference to the issue in Article 17 reveals a purpose to evade the constitution through the creation of a pretended class that would benefit only Crown. *Cf. Finley*, 54 S.W. at 345 (citing Pennsylvania case in discussion of pretended class, which noted that its legislature had engaged in "a studied and constant effort" to evade constitutional prohibition against local and special legislation).

This Court has considered legislation with highly specific classifications, allegedly applicable to only one entity, that resemble Satterfield's special law challenge to chapter 149. *See Juliff Gardens*, 131 S.W.3d at 283. In our review of the summary judgment in *Juliff Gardens*, appellant emphasized excerpts from a Senate floor discussion as evidence that one senator was attempting to specifically "target" the Juliff landfill with the legislation. *Id*. at 282-83. The legislative classifications at issue applied only to permits that had been recommended for denial by

43

a county commissioners' resolution, concerning landfills containing type IV waste (brush, construction-demolition waste, and/or other non-putrescible, non-household rubbish), that were located within 100 feet of a canal used for public drinking water or crop irrigation, in counties with populations exceeding 225,000, and adjacent to the Gulf of Mexico. *Id*. at 275. These statutory classifications, among others, were based on the following facts: type IV landfills were less regulated than others; the potential effects of pollution would produce greater harm to the population centers, aquatic habitat, and fishing in coastal counties; and it would be unwise to place a landfill near low-circulation canals or in areas susceptible to hurricanes, tidal surges, and other climatic conditions. *Id*. at 284.

This Court held that the classifications were reasonable and not specifically targeted at Juliff's landfill. *Id*. at 283 & n.8. We clarified that when presented with legislation that is challenged as a special law, "we review the reasonableness of the statute's classifications, . . . not the precipitating forces that led to its enactment." *Id*. at 283. That the legislation may have had its origin in local controversy, which then led one senator to sponsor the particular amendment that was eventually enacted, did not render it a prohibited local or special law. *Id*. at 283-84.[25]

Similarly, review for possible infringement of article III, section 56 in this case is not based on any precipitating forces leading to the enactment of chapter 149 but whether its legislative

---

[25] In *Juliff Gardens v. Texas Comm'n on Envtl. Quality*, we noted that specific events have led to numerous statutes that were enacted as laws of general applicability, including the AMBER alert law and the Brady bill. 131 S.W.3d 271, 282-83 (Tex. App.—Austin 2004, no pet.) (citing Tex. Gov't Code Ann. §§ 411.351-.358 (West 2005) (Statewide America's Missing: Broadcast Emergency Response (AMBER) Alert System for Abducted Children); 18 U.S.C.A. § 921-31 (West 2000 & Supp. 2008) (Brady Handgun Violence Prevention Act)).

classifications are reasonable. *See Sheldon*, 22 S.W.3d at 451. For the reasons that follow, I conclude that they are.

Chapter 149 is written in general terms, applicable to all within the defined class, and does not single out any particular member of the class for special treatment. The specific classifications in chapter 149 were intended to include successor corporations that "were the most innocent about the potential hazards of asbestos" and "at the greatest financial peril, especially those threatened with bankruptcy." H.J. of Tex., 78th Leg., R.S. 6043. When the legislation was considered, concerns were raised about the substantial cost in jobs and pension benefits. *Id*. at 6044. To address those concerns and target the most innocent successors, one classification required that the liability to be imposed must be based on the original transfer of successor asbestos liabilities that occurred prior to May 13, 1968. *Id*.; *see also* Tex. Civ. Prac. & Rem. Code Ann. §§ 149.001(3) (defining "successor asbestos-related liabilities"), .002(a). Subsequent successors may qualify under the statute if they receive only that same bundle of original asbestos liabilities through successive mergers. H.J. of Tex., 78th Leg., R.S. 6043; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 149.002(a).

Another classification in chapter 149 restricted the liability limitation to successor corporations that did not continue their predecessors' business of mining, selling, or distributing asbestos fibers, or manufacturing, distributing, installing, or removing asbestos-containing products. Tex. Civ. Prac. & Rem. Code Ann. § 149.002(b)(5). The legislature sought to accomplish its goals "without limiting every type of asbestos liability." H.J. of Tex., 78th Leg., R.S. 6043; *see also* Tex. Civ. Prac. & Rem. Code Ann. §§ 149.002(b)(8) (excluding from statute a successor

45

asbestos-related liability arising from certain premises liability claims), .003(a), (b) (statute is inapplicable to corporations that have not yet exceeded their statutory limit).

Rather than demonstrating that it is a special law, the precision of the classifications in chapter 149 shows that it is narrowly tailored to serve its purposes: to prevent asbestos-related liabilities from bankrupting innocent successor corporations and creating a negative economic effect on employees and pensioners. *See* H.J. of Tex., 78th Leg., R.S. 6044. Through chapter 149, the legislature addressed the economic concerns that implicate the ability of successor corporations to continue to provide jobs and pension benefits. These are matters of importance to Texas and its citizens. *See Barbier*, 113 U.S. at 31; *see also Robinson*, 251 S.W.3d at 538.

Based on this record, I conclude that a reasonable relationship exists between the classifications and the objectives sought to be accomplished by chapter 149 and that article III, section 56 of the constitution is not violated. *See Davis*, 426 S.W.2d at 830. The wisdom or expediency of chapter 149 is the legislature's prerogative, not ours. *See id.* at 831. Satterfield provides alternatives to the stated reasoning of the legislature, but she does not contradict the significance of the asbestos crisis to corporations, including those doing business in Texas, or the other legislative justifications for chapter 149, and she has not shown that the classifications set forth in chapter 149 are unreasonable. For these reasons, I conclude that Satterfield has not met her burden of demonstrating that chapter 149 is a special law.

Having concluded that Satterfield's challenges to chapter 149 as a retroactive law and as a special law do not defeat the presumption of the statute's validity, *see Barshop*, 925 S.W.2d

at 629, consideration must be given to the establishment of Crown's affirmative defense under chapter 149.

**Crown's summary judgment burden**

Although Satterfield's second issue urged that the legislative classifications in chapter 149 were tailor-made for Crown, her third issue insists that chapter 149 does not apply to Crown at all. In her third issue, Satterfield argues that summary judgment was improper because her evidence created a fact issue about whether Crown continued the asbestos business after "acquiring" Mundet. Based on her incorrect interpretation of section 149.002(b)(5) of the civil practice and remedies code, she alleges that Crown was ineligible for chapter 149's liability limitation.

### *Stock purchase vs. merger under section 149.002(b)(5)*

The parties dispute when Crown became Mundet's successor. Satterfield asserts that Crown became Mundet's successor and first incurred successor asbestos-related liabilities in 1963, after Crown's $7 million purchase of Mundet's stock. Crown contends that it became Mundet's successor in 1966 when the corporations merged. The distinction between a merger and a stock purchase is significant because of the text of chapter 149. The relevant subsection of the statute—noticeably omitted from Satterfield's brief—states that the successor-liability limitation is inapplicable to:

> a successor that, after a *merger or consolidation*, continued in the business of mining asbestos or in the business of selling or distributing asbestos fibers or in the business of manufacturing, distributing, removing, or installing asbestos-containing products which were the same or substantially the same as those products previously manufactured, distributed, removed, or installed by the transferor.

47

Tex. Civ. Prac. & Rem. Code Ann. § 149.002(b)(5) (emphasis added). Nothing in subsection 149.002(b)(5) addresses corporations who continue the business of asbestos after a *stock purchase*.

Nevertheless, Satterfield emphasizes that successor asbestos-related liabilities need not originate with corporate mergers. She asserts that successor asbestos-related liabilities includes those "related in any way to asbestos claims based on the exercise of control or the ownership of stock of the corporation before the merger or consolidation." *See id.* § 149.001(3). Based on testimony from a former Mundet employee, E.J. Stansbury,[26] Satterfield contends that Crown continued Mundet's asbestos business after the 1963 stock purchase, and that Crown was therefore ineligible, under subsection 149.002(b)(5), for the statutory liability limitation. The fallacy of Satterfield's suggestion that subsection 149.002(b)(5) applies to stock purchases is revealed by the text of the statute.

### Testimony about pre-merger events

Satterfield relies on Stansbury's 1983 deposition testimony in another lawsuit to argue that there is a fact issue about whether Crown continued Mundet's asbestos business for several months after its stock purchase. However, Stansbury's testimony relates exclusively to activity *before* the 1966 Crown-Mundet merger. Stansbury testified that he was in charge of Mundet's operation in Houston between 1963 and 1964, which includes the time period when Crown purchased Mundet's stock. He was asked whether he knew Mundet employees that went to work for Crown when Mundet sold to Crown, and he responded affirmatively. He also responded

---

[26] Stansbury is deceased.

48

affirmatively when asked whether Crown continued to sell, contract for, and fill orders for Mundet products, including those containing asbestos, for three months.[27]

Pre-merger events are irrelevant under subsection 149.002(b)(5). *See id*.; *see also Robinson*, 251 S.W.3d at 540. That subsection addresses a successor's continuation of its predecessor's asbestos business after their merger and excludes such a successor from the statute's liability limitation. Tex. Civ. Prac. & Rem. Code Ann*.* § 149.002(b)(5). The summary-judgment evidence shows that Stansbury did not work for Crown during the statutorily relevant time period—*after* the 1966 Crown-Mundet merger. Stansbury testified that he began working for B-E-H in February 1964, when B-E-H purchased Mundet's insulation division.[28] His testimony did not raise a fact issue about whether Crown continued Mundet's asbestos business after the 1966 merger. Because Stansbury's testimony fails to allege facts concerning a post-merger continuation of Mundet's asbestos business, it does not invoke subsection 149.002(b)(5).

### Evidence in pre-merger bill of sale

Satterfield also notes that Mundet's bill of sale to B-E-H in 1963 referred to Mundet as "a Division of Crown Cork & Seal," and was signed by Crown's chairman of the board on behalf of "Mundet Cork Corporation, a Division of Crown Cork & Seal Company, Inc." Like Stansbury's testimony, this evidence too, fails to raise a fact question about whether Crown is excluded from

---

[27] It is undisputed that Stansbury did not participate in the stock-purchase transaction, did not work at the location where the transaction was handled, and knew nothing about the transaction or Mundet's independent existence.

[28] It is undisputed that B-E-H acquired Mundet's employees as part of B-E-H's purchase of Mundet's insulation division on February 8, 1964.

chapter 149's limitation of liability because the bill of sale predates the 1966 Crown-Mundet merger. The plain language of the statute concerns a successor's continuation of its predecessor's asbestos-related business "*after* a merger or consolidation." *See id*. (emphasis added); *see also Robinson*, 251 S.W.3d at 540.

The entirety of Satterfield's summary judgment evidence relates to pre-merger events before 1966, none of which constitute continuing the asbestos-related business as defined in subsection 149.002(b)(5). *See* Tex. Civ. Prac. & Rem. Code Ann. § 149.002(b)(5); *see also Robinson*, 251 S.W.3d at 540.

### *Crown's uncontroverted evidence*

Crown produced uncontroverted summary judgment evidence from its former secretary and general counsel, Richard Krzyzanowski, who averred that Crown never engaged in the asbestos business. He explained that by the time of Crown's 1966 merger with Mundet, Mundet had divested itself of its previous insulation operations. Krzyzanowski further averred that Crown itself "never manufactured, distributed, advertised, sold, or installed any asbestos-containing or other insulation products."

Based on this record, I conclude that Satterfield failed to raise an issue of material fact concerning Crown's continuation in the business of asbestos after the merger that would trigger the exclusion of section 149.002(b)(5) of the civil practice and remedies code and that Crown has demonstrated its entitlement to summary judgment based on the limitation of liability in chapter 149.

50

**CONCLUSION**

The theory of successor liability serves a useful function in Texas law, but it is not recognized as one of the "great and essential principles of liberty and free government" that receive constitutional protection. *See* Tex. Const. art. I. The majority declares that the trial court erred in granting summary judgment, but in doing so, it rejects certain holdings of the Texas Supreme Court and persuasive authority from the Fifth Circuit, as well as principles recognized in the author's own prior opinions. Furthermore, by accepting Satterfield's invitation to invalidate chapter 149, the majority unnecessarily binds the legislature to existing choice-of-law rules.

The trial court ruled correctly in granting this summary judgment. Satterfield failed to meet her heavy burden of demonstrating that chapter 149 is unconstitutional as applied to her case under article I section 16 or under article III section 56 of the Texas Constitution, and Crown conclusively established its affirmative defense limiting its successor liability. Accordingly, I would affirm the trial court's order.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Henson

Filed: August 29, 2008

51